MAHER, COMMISSIONER OF SOCIAL SERVICES OF
CONNECTICUT *v.* ROE ET AL.

No. 75–1440.   Argued January 11, 1977—Decided June 20, 1977

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, REHNQUIST, and STEVENS, JJ., joined. BURGER, C. J., filed a concurring statement, *post,* p. 481. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post,* p. 482. MARSHALL, J., filed a dissenting opinion, *ante,* p. 454. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *ante,* p. 462.

*Edmund C. Walsh,* Assistant Attorney General of Connecticut, argued the cause for appellant. With him on the brief was *Carl R. Ajello,* Attorney General.

*Lucy V. Katz* argued the cause for appellees. With her on the brief were *Kathryn Emmett* and *Catherine Roraback.**

MR. JUSTICE POWELL delivered the opinion of the Court.

In *Beal* v. *Doe, ante,* p. 438, we hold today that Title XIX of the Social Security Act does not require the funding of nontherapeutic abortions as a condition of participation in the

---

*\*William F. Hyland,* Attorney General, *Stephen Skillman,* Assistant Attorney General, and *Erminie L. Conley,* Deputy Attorney General, filed a brief for the State of New Jersey as *amicus curiae* urging reversal.

*Sylvia A. Law, Harriet F. Pilpel,* and *Eve W. Paul* filed a brief for the American Public Health Assn. et al. as *amici curiae* urging affirmance.

*Patricia A. Butler* and *Michael A. Wolff* filed a brief for Jane Doe as *amicus curiae.*

joint federal-state Medicaid program established by that statute. In this case, as a result of our decision in *Beal,* we must decide whether the Constitution requires a participating State to pay for nontherapeutic abortions when it pays for childbirth.

## I

A regulation of the Connecticut Welfare Department limits state Medicaid benefits for first trimester abortions [1] to those that are "medically necessary," a term defined to include psychiatric necessity. Connecticut Welfare Department, Public Assistance Program Manual, Vol. 3, c. III, § 275 (1975).[2] Connecticut enforces this limitation through a system of prior authorization from its Department of Social Services. In order to obtain authorization for a first trimester abortion, the hospital or clinic where the abortion is to be performed must submit, among other things, a certificate from the patient's attending physician stating that the abortion is medically necessary.

This attack on the validity of the Connecticut regulation

---

[1] The procedures governing abortions beyond the first trimester are not challenged here.

[2] Section 275 provides in relevant part:

"The Department makes payment for abortion services under the Medical Assistance (Title XIX) Program when the following conditions are met:

"1. In the opinion of the attending physician the abortion is medically necessary. The term 'Medically Necessary' includes psychiatric necessity.

"2. The abortion is to be performed in an accredited hospital or licensed clinic when the patient is in the first trimester of pregnancy. . . .

"3. The written request for the abortion is submitted by the patient, and in the case of a minor, from the parent or guardian.

"4. Prior authorization for the abortion is secured from the Chief of Medical Services, Division of Health Services, Department of Social Services."

See n. 4, *infra.*

was brought against appellant Maher, the Commisioner of Social Services, by appellees Poe and Roe, two indigent women who were unable to obtain a physician's certificate of medical necessity.[3] In a complaint filed in the United States District Court for the District of Connecticut, they challenged the regulation both as inconsistent with the requirements of Title XIX of the Social Security Act, as added, 79 Stat. 343, as amended, 42 U. S. C. § 1396 *et seq.* (1970 ed. and Supp. V), and as violative of their constitutional rights, including the Fourteenth Amendment's guarantees of due process and equal protection. Connecticut originally defended its regulation on the theory that Title XIX of the Social Security Act prohibited the funding of abortions that were not medically necessary. After certifying a class of women unable to obtain Medicaid assistance for abortions because of the regulation, the District Court held that the Social Security Act not only allowed state funding of nontherapeutic abortions but also required it. *Roe* v. *Norton,* 380 F. Supp. 726 (1974). On appeal, the Court of Appeals for the Second Circuit read the Social Security Act to allow, but not to require, state funding of such abortions. 522 F. 2d 928 (1975). Upon remand for consideration of the constitutional issues raised in the complaint, a three-judge District Court was convened. That court invalidated the Connecticut regulation. 408 F. Supp. 660 (1975).

---

[3] At the time this action was filed, Mary Poe, a 16-year-old high school junior, had already obtained an abortion at a Connecticut hospital. Apparently because of Poe's inability to obtain a certificate of medical necessity, the hospital was denied reimbursement by the Department of Social Services. As a result, Poe was being pressed to pay the hospital bill of $244. Susan Roe, an unwed mother of three children, was unable to obtain an abortion because of her physician's refusal to certify that the procedure was medically necessary. By consent, a temporary restraining order was entered by the District Court enjoining the Connecticut officials from refusing to pay for Roe's abortion. After the remand from the Court of Appeals, the District Court issued temporary restraining orders covering three additional women. *Roe* v. *Norton,* 408 F. Supp. 660, 663 (1975).

Although it found no independent constitutional right to a state-financed abortion, the District Court held that the Equal Protection Clause forbids the exclusion of nontherapeutic abortions from a state welfare program that generally subsidizes the medical expenses incident to pregnancy and childbirth. The court found implicit in *Roe* v. *Wade,* 410 U. S. 113 (1973), and *Doe* v. *Bolton,* 410 U. S. 179 (1973), the view that "abortion and childbirth, when stripped of the sensitive moral arguments surrounding the abortion controversy, are simply two alternative medical methods of dealing with pregnancy . . . ." 408 F. Supp., at 663 n. 3. Relying also on *Shapiro* v. *Thompson,* 394 U. S. 618 (1969), and *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250 (1974), the court held that the Connecticut program "weights the choice of the pregnant mother against choosing to exercise her constitutionally protected right" to a nontherapeutic abortion and "thus infringes upon a fundamental interest." 408 F. Supp., at 663–664. The court found no state interest to justify this infringement. The State's fiscal interest was held to be "wholly chimerical because abortion is the least expensive medical response to a pregnancy." *Id.,* at 664 (footnote omitted). And any moral objection to abortion was deemed constitutionally irrelevant:

> "The state may not justify its refusal to pay for one type of expense arising from pregnancy on the basis that it morally opposes such an expenditure of money. To sanction such a justification would be to permit discrimination against those seeking to exercise a constitutional right on the basis that the state simply does not approve of the exercise of that right." *Ibid.*

The District Court enjoined the State from requiring the certificate of medical necessity for Medicaid-funded abortions.[4]

---

[4] The District Court's judgment and order, entered on January 16, 1976, were not stayed. On January 26, 1976, the Department of Social Services revised § 275 to allow reimbursement for nontherapeutic abortions without

The court also struck down the related requirements of prior written request by the pregnant woman and prior authorization by the Department of Social Services, holding that the State could not impose any requirements on Medicaid payments for abortions that are not "equally applicable to medicaid payments for childbirth, if such conditions or requirements tend to discourage a woman from choosing an abortion or to delay the occurrence of an abortion that she has asked her physician to perform." *Id.*, at 665. We noted probable jurisdiction to consider the constitutionality of the Connecticut regulation. 428 U. S. 908 (1976).

## II

The Constitution imposes no obligation on the States to pay the pregnancy-related medical expenses of indigent women, or indeed to pay any of the medical expenses of indigents.[5] But when a State decides to alleviate some of the

---

prior authorization or consent. The fact that this revision was made retroactive to January 16, 1976, suggests that the revision was made only for the purpose of interim compliance with the District Court's judgment and order, which were entered the same date. No suggestion of mootness has been made by any of the parties, and this appeal was taken and submitted on the theory that Connecticut desires to reinstate the invalidated regulation. Under these circumstances, the subsequent revision of the regulation does not render the case moot. In any event, there would remain the denial of reimbursement to Mary Poe, and similarly situated members of the class, under the prerevision regulation. See 380 F. Supp., at 730 n. 3. The State has asserted no Eleventh Amendment defense to this relief sought by Poe and those whom she represents.

[5] *Boddie* v. *Connecticut*, 401 U. S. 371 (1971), cited by appellees, is not to the contrary. There the Court invalidated under the Due Process Clause "certain state procedures for the commencement of litigation, including requirements for payment of court fees and costs for service of process," restricting the ability of indigent persons to bring an action for divorce. *Id.*, at 372. The Court held:

"[G]iven the basic position of the marriage relationship in this society's hierarchy of values and the concomitant state monopolization of the

hardships of poverty by providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations. Appellees' claim is that Connecticut must accord equal treatment to both abortion and childbirth, and may not evidence a policy preference by funding only the medical expenses incident to childbirth. This challenge to the classifications established by the Connecticut regulation presents a question arising under the Equal Protection Clause of the Fourteenth Amendment. The basic framework of analysis of such a claim is well settled:

"We must decide, first, whether [state legislation] operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. . . . If not, the [legislative] scheme must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination . . . ." *San Antonio School Dist.* v. *Rodriguez,* 411 U. S. 1, 17 (1973).

Accord, *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 312, 314 (1976). Applying this analysis here, we think the District Court erred in holding that the Connecticut regulation violated the Equal Protection Clause of the Fourteenth Amendment.

## A

This case involves no discrimination against a suspect class. An indigent woman desiring an abortion does not come within

means for legally dissolving this relationship, due process does prohibit a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages." *Id.,* at 374. Because Connecticut has made no attempt to monopolize the means for terminating pregnancies through abortion the present case is easily distinguished from *Boddie.* See also *United States* v. *Kras,* 409 U. S. 434 (1973); *Ortwein* v. *Schwab,* 410 U. S. 656 (1973).

the limited category of disadvantaged classes so recognized by our cases. Nor does the fact that the impact of the regulation falls upon those who cannot pay lead to a different conclusion. In a sense, every denial of welfare to an indigent creates a wealth classification as compared to nonindigents who are able to pay for the desired goods or services. But this Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis. See *Rodriguez, supra*, at 29; *Dandridge* v. *Williams*, 397 U. S. 471 (1970).[6] Accordingly, the central question in this case is whether the regulation "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." The District Court read our decisions in *Roe* v. *Wade*, 410 U. S. 113 (1973), and the subsequent cases applying it, as establishing a fundamental right to abortion and therefore concluded that nothing less than a compelling state interest would justify Connecticut's different treatment of abortion and childbirth. We think the District Court misconceived the nature and scope of the fundamental right recognized in *Roe*.

## B

At issue in *Roe* was the constitutionality of a Texas law making it a crime to procure or attempt to procure an abortion, except on medical advice for the purpose of saving the life of the mother. Drawing on a group of disparate cases restricting governmental intrusion, physical coercion, and criminal prohibition of certain activities, we concluded that the Fourteenth Amendment's concept of personal liberty

---

[6] In cases such as *Griffin* v. *Illinois*, 351 U. S. 12 (1956) and *Douglas* v. *California*, 372 U. S. 353 (1963), the Court held that the Equal Protection Clause requires States that allow appellate review of criminal convictions to provide indigent defendants with trial transcripts and appellate counsel. These cases are grounded in the criminal justice system, a governmental monopoly in which participation is compelled. Cf. n. 5, *supra*. Our subsequent decisions have made it clear that the principles underlying *Griffin* and *Douglas* do not extend to legislative classifications generally.

affords constitutional protection against state interference with certain aspects of an individual's personal "privacy," including a woman's decision to terminate her pregnancy.[7] *Id.,* at 153.

The Texas statute imposed severe criminal sanctions on the physicians and other medical personnel who performed abortions, thus drastically limiting the availability and safety of the desired service. As MR. JUSTICE STEWART observed, "it is difficult to imagine a more complete abridgment of a constitutional freedom . . . ." *Id.,* at 170 (concurring opinion). We held that only a compelling state interest would justify such a sweeping restriction on a constitutionally protected interest, and we found no such state interest during the first trimester. Even when judged against this demanding standard, however, the State's dual interest in the health of the pregnant woman and the potential life of the fetus were deemed sufficient to justify substantial regulation of abortions in the second and third trimesters. "These interests are separate and distinct. Each grows in substantiality as the woman approaches term and, at a point during pregnancy, each becomes 'compelling.' " *Id.,* at 162–163. In the second trimester, the State's interest in the health of the pregnant woman justifies state regulation reasonably related to that concern. *Id.,* at 163. At viability, usually in the third trimester, the State's interest in the potential life of the fetus justifies prohibition with criminal penalties, except where the life or health of the mother is threatened. *Id.,* at 163–164.

The Texas law in *Roe* was a stark example of impermissible interference with the pregnant woman's decision to terminate her pregnancy. In subsequent cases, we have invalidated

---

[7] A woman has at least an equal right to choose to carry her fetus to term as to choose to abort it. Indeed, the right of procreation without state interference has long been recognized as "one of the basic civil rights of man . . . fundamental to the very existence and survival of the race." *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535, 541 (1942).

other types of restrictions, different in form but similar in effect, on the woman's freedom of choice. Thus, in *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52, 70–71, n. 11 (1976), we held that Missouri's requirement of spousal consent was unconstitutional because it "granted [the husband] the right to prevent unilaterally, and for whatever reason, the effectuation of his wife's and her physician's decision to terminate her pregnancy." Missouri had interposed an *"absolute obstacle* to a woman's decision that *Roe* held to be constitutionally protected from such interference." (Emphasis added.) Although a state-created obstacle need not be absolute to be impermissible, see *Doe* v. *Bolton,* 410 U. S. 179 (1973); *Carey* v. *Population Services International,* 431 U. S. 678 (1977), we have held that a requirement for a lawful abortion "is not unconstitutional unless it unduly burdens the right to seek an abortion." *Bellotti* v. *Baird,* 428 U. S. 132, 147 (1976). We recognized in *Bellotti* that "not all distinction between abortion and other procedures is forbidden" and that "[t]he constitutionality of such distinction will depend upon its degree and the justification for it." *Id.,* at 149–150. We therefore declined to rule on the constitutionality of a Massachusetts statute regulating a minor's access to an abortion until the state courts had had an opportunity to determine whether the statute authorized a parental veto over the minor's decision or the less burdensome requirement of parental consultation.

These cases recognize a constitutionally protected interest "in making certain kinds of important decisions" free from governmental compulsion. *Whalen* v. *Roe,* 429 U. S. 589, 599–600, and nn. 24 and 26 (1977). As *Whalen* makes clear, the right in *Roe* v. *Wade* can be understood only by considering both the woman's interest and the nature of the State's interference with it. *Roe* did not declare an unqualified "constitutional right to an abortion," as the District Court seemed to think. Rather, the right protects the woman from

unduly burdensome interference with her freedom to decide whether to terminate her pregnancy. It implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds.

The Connecticut regulation before us is different in kind from the laws invalidated in our previous abortion decisions. The Connecticut regulation places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult—and in some cases, perhaps, impossible—for some women to have abortions is neither created nor in any way affected by the Connecticut regulation. We conclude that the Connecticut regulation does not impinge upon the fundamental right recognized in *Roe*.[8]

---

[8] Appellees rely on *Shapiro* v. *Thompson*, 394 U. S. 618 (1969), and *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250 (1974). In those cases durational residence requirements for the receipt of public benefits were found to be unconstitutional because they "penalized" the exercise of the constitutional right to travel interstate.

Appellees' reliance on the penalty analysis of *Shapiro* and *Maricopa County* is misplaced. In our view there is only a semantic difference between appellees' assertion that the Connecticut law unduly interferes with a woman's right to terminate her pregnancy and their assertion that it penalizes the exercise of that right. Penalties are most familiar to the criminal law, where criminal sanctions are imposed as a consequence of proscribed conduct. *Shapiro* and *Maricopa County* recognized that denial of welfare to one who had recently exercised the right to travel across state lines was sufficiently analogous to a criminal fine to justify strict judicial scrutiny.

If Connecticut denied general welfare benefits to all women who had

## C

Our conclusion signals no retreat from *Roe* or the cases applying it. There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.[9]

---

obtained abortions and who were otherwise entitled to the benefits, we would have a close analogy to the facts in *Shapiro,* and strict scrutiny might be appropriate under either the penalty analysis or the analysis we have applied in our previous abortion decisions. But the claim here is that the State "penalizes" the woman's decision to have an abortion by refusing to pay for it. *Shapiro* and *Maricopa County* did not hold that States would penalize the right to travel interstate by refusing to pay the bus fares of the indigent travelers. We find no support in the right-to-travel cases for the view that Connecticut must show a compelling interest for its decision not to fund elective abortions.

*Sherbert* v. *Verner,* 374 U. S. 398 (1963), similarly is inapplicable here. In addition, that case was decided in the significantly different context of a constitutionally imposed "governmental obligation of neutrality" originating in the Establishment and Freedom of Religion Clauses of the First Amendment. *Id.,* at 409.

[9] In *Buckley* v. *Valeo,* 424 U. S. 1 (1976), we drew this distinction in sustaining the public financing of the Federal Election Campaign Act of 1971. The Act provided public funds to some candidates but not to others. We rejected an asserted analogy to cases such as *American Party of Texas* v. *White,* 415 U. S. 767 (1974), which involved restrictions on access to the electoral process:

"These cases, however, dealt primarily with state laws requiring a candidate to satisfy certain requirements in order to have his name appear on the ballot. These were, of course, *direct burdens* not only on the candidate's ability to run for office but also on the voter's ability to voice preferences regarding representative government and contemporary issues. In contrast, the denial of public financing to some Presidential candidates is not restrictive of voters' rights and less restrictive of candidates'. Subtitle H does not prevent any candidate from getting on the ballot or any voter from casting a vote for the candidate of his choice; *the inability, if any, of minority party candidates to wage effective campaigns will derive not from lack of public funding but from their inability to raise private contributions.* Any disadvantage suffered by operation of the eligibility formulae under Subtitle H is thus limited to the claimed denial

476

Constitutional concerns are greatest when the State attempts
to impose its will by force of law; the State's power to en-
courage actions deemed to be in the public interest is neces-
sarily far broader.

This distinction is implicit in two cases cited in *Roe* in sup-
port of the pregnant woman's right under the Fourteenth
Amendment. *Meyer* v. *Nebraska,* 262 U. S. 390 (1923),
involved a Nebraska law making it criminal to teach
foreign languages to children who had not passed the
eighth grade. *Id.,* at 396–397. Nebraska's imposition of
a criminal sanction on the providers of desired services
makes *Meyer* closely analogous to *Roe.* In sustaining the
constitutional challenge brought by a teacher convicted under
the law, the Court held that the teacher's "right thus to
teach and the right of parents to engage him so to instruct
their children" were "within the liberty of the Amendment."
262 U. S., at 400. In *Pierce* v. *Society of Sisters,* 268 U. S. 510
(1925), the Court relied on *Meyer* to invalidate an Oregon
criminal law requiring the parent or guardian of a child to
send him to a public school, thus precluding the choice of a
private school. Reasoning that the Fourteenth Amendment's
concept of liberty "excludes any general power of the State to
standardize its children by forcing them to accept instruction
from public teachers only," the Court held that the law "un-
reasonably interfere[d] with the liberty of parents and guard-
ians to direct the upbringing and education of children under
their control." 268 U. S., at 534–535.

Both cases invalidated substantial restrictions on con-
stitutionally protected liberty interests: in *Meyer,* the parent's
right to have his child taught a particular foreign language;
in *Pierce,* the parent's right to choose private rather than
public school education. But neither case denied to a State

of the enhancement of opportunity to communicate with the electorate
that the formulae afford eligible candidates." 424 U. S., at 94–95 (emphasis
added; footnote omitted).

the policy choice of encouraging the preferred course of action. Indeed, in *Meyer* the Court was careful to state that the power of the State "to prescribe a curriculum" that included English and excluded German in its free public schools "is not questioned." 262 U. S., at 402. Similarly, *Pierce* casts no shadow over a State's power to favor public education by funding it—a policy choice pursued in some States for more than a century. See *Brown* v. *Board of Education,* 347 U. S. 483, 489 n. 4 (1954). Indeed, in *Norwood* v. *Harrison,* 413 U. S. 455, 462 (1973), we explicitly rejected the argument that *Pierce* established a "right of private or parochial schools to share with public schools in state largesse," noting that "[i]t is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid." Yet, were we to accept appellees' argument, an indigent parent could challenge the state policy of favoring public rather than private schools, or of preferring instruction in English rather than German, on grounds identical in principle to those advanced here. We think it abundantly clear that a State is not required to show a compelling interest for its policy choice to favor normal childbirth any more than a State must so justify its election to fund public but not private education.[10]

---

[10] In his dissenting opinion, MR. JUSTICE BRENNAN rejects the distinction between direct state interference with a protected activity and state encouragement of an alternative activity and argues that our previous abortion decisions are inconsistent with today's decision. But as stated above, all of those decisions involved laws that placed substantial state-created obstacles in the pregnant woman's path to an abortion. Our recent decision in *Carey* v. *Population Services International,* 431 U. S. 678 (1977), differs only in that it involved state-created restrictions on access to contraceptives, rather than abortions. MR. JUSTICE BRENNAN simply asserts that the Connecticut regulation "is an obvious impairment of the fundamental right established by *Roe* v. *Wade*." *Post,* at 484–485. The only suggested source for this purportedly "obvious" conclusion is a quotation

## D

The question remains whether Connecticut's regulation can be sustained under the less demanding test of rationality that applies in the absence of a suspect classification or the impingement of a fundamental right. This test requires that the distinction drawn between childbirth and nontherapeutic abortion by the regulation be "rationally related" to a "constitutionally permissible" purpose. *Lindsey* v. *Normet,* 405 U. S. 56, 74 (1972); *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S., at 314. We hold that the Connecticut funding scheme satisfies this standard.

*Roe* itself explicitly acknowledged the State's strong interest in protecting the potential life of the fetus. That interest exists throughout the pregnancy, "grow[ing] in substantiality as the woman approaches term." 410 U. S., at 162–163. Because the pregnant woman carries a potential human being, she "cannot be isolated in her privacy. . . . [Her] privacy is no longer sole and any right of privacy she possesses must be measured accordingly." *Id.,* at 159. The State unquestionably has a "strong and legitimate interest in encouraging normal childbirth," *Beal* v. *Doe, ante,* at 446, an interest honored over the centuries.[11] Nor can there be any question that the Connecticut regulation rationally furthers that interest. The medical costs associated with childbirth are substantial, and have increased significantly in recent years. As

from *Singleton* v. *Wulff,* 428 U. S. 106 (1976). Yet, as Mr. Justice Blackmun was careful to note at the beginning of his opinion in *Singleton,* that case presented "issues [of standing] not going to the merits of this dispute." *Id.,* at 108. Significantly, Mr. Justice Brennan makes no effort to distinguish or explain the much more analogous authority of *Norwood* v. *Harrison,* 413 U. S. 455 (1973).

[11] In addition to the direct interest in protecting the fetus, a State may have legitimate demographic concerns about its rate of population growth. Such concerns are basic to the future of the State and in some circumstances could constitute a substantial reason for departure from a position of neutrality between abortion and childbirth.

recognized by the District Court in this case, such costs are significantly greater than those normally associated with elective abortions during the first trimester. The subsidizing of costs incident to childbirth is a rational means of encouraging childbirth.

We certainly are not unsympathetic to the plight of an indigent woman who desires an abortion, but "the Constitution does not provide judicial remedies for every social and economic ill," *Lindsey* v. *Normet, supra,* at 74. Our cases uniformly have accorded the States a wider latitude in choosing among competing demands for limited public funds.[12] In *Dandridge* v. *Williams,* 397 U. S., at 485, despite recognition that laws and regulations allocating welfare funds involve "the most basic economic needs of impoverished human beings," we held that classifications survive equal protection challenge when a "reasonable basis" for the classification is shown. As the preceding discussion makes clear, the state interest in encouraging normal childbirth exceeds this minimal level.

The decision whether to expend state funds for nontherapeutic abortion is fraught with judgments of policy and value over which opinions are sharply divided. Our conclusion that the Connecticut regulation is constitutional is not based on a weighing of its wisdom or social desirability, for this Court does not strike down state laws "because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 488 (1955), quoted in *Dandridge* v. *Williams, supra,* at 484. Indeed, when an issue involves policy choices as sensitive as those implicated by public funding of nontherapeutic abortions, the appropriate forum for their resolution in a democracy is the legislature. We should not forget that "legisla-

---

[12] See generally Wilkinson, The Supreme Court, the Equal Protection Clause, and the Three Faces of Constitutional Equality, 61 Va. L. Rev. 945, 998–1017 (1975).

tures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." *Missouri, K. & T. R. Co. v. May,* 194 U. S. 267, 270 (1904) (Holmes, J.).[13]

In conclusion, we emphasize that our decision today does not proscribe government funding of nontherapeutic abortions. It is open to Congress to require provision of Medicaid benefits for such abortions as a condition of state participation in the Medicaid program. Also, under Title XIX as construed in *Beal v. Doe, ante,* p. 438, Connecticut is free—through normal democratic processes—to decide that such benefits should be provided. We hold only that the Constitution does not require a judicially imposed resolution of these difficult issues.

## III

The District Court also invalidated Connecticut's requirements of prior written request by the pregnant woman and prior authorization by the Department of Social Services. Our analysis above rejects the basic premise that prompted invalidation of these procedural requirements. It is not unreasonable for a State to insist upon a prior showing of medical necessity to insure that its money is being spent only for authorized purposes. The simple answer to the argument that similar requirements are not imposed for other medical procedures is that such procedures do not involve the termination of a potential human life. In *Planned Parenthood of Central Missouri v. Danforth,* 428 U. S. 52 (1976), we held that the woman's written consent to an abortion was not an impermissible burden under *Roe.* We think that decision is controlling on the similar issue here.

---

[13] Much of the rhetoric of the three dissenting opinions would be equally applicable if Connecticut had elected not to fund either abortions or childbirth. Yet none of the dissents goes so far as to argue that the Constitution *requires* such assistance for all indigent pregnant women.

The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

[For dissenting opinion of MR. JUSTICE MARSHALL, see *ante,* p. 454.]

[For dissenting opinion of MR. JUSTICE BLACKMUN, see *ante,* p. 462.]

MR. CHIEF JUSTICE BURGER, concurring.

I join the Court's opinion. Like the Court, I do not read any decision of this Court as requiring a State to finance a nontherapeutic abortion. The Court's holdings in *Roe* v. *Wade,* 410 U. S. 113 (1973), and *Doe* v. *Bolton,* 410 U. S. 179 (1973), simply require that a State not create an absolute barrier to a woman's decision to have an abortion. These precedents do not suggest that the State is constitutionally required to assist her in procuring it.

From time to time, every state legislature determines that, as a matter of sound public policy, the government ought to provide certain health and social services to its citizens. Encouragement of childbirth and child care is not a novel undertaking in this regard. Various governments, both in this country and in others, have made such a determination for centuries. In recent times, they have similarly provided educational services. The decision to provide any one of these services—or not to provide them—is not required by the Federal Constitution. Nor does the providing of a particular service require, as a matter of federal constitutional law, the provision of another.

Here, the State of Connecticut has determined that it will finance certain childbirth expenses. That legislative deter-

mination places no state-created barrier to a woman's choice to procure an abortion, and it does not require the State to provide it. Accordingly, I concur in the judgment.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MAR-SHALL and MR. JUSTICE BLACKMUN join, dissenting.

The District Court held:

> "When Connecticut refuses to fund elective abortions while funding therapeutic abortions and prenatal and postnatal care, it weights the choice of the pregnant mother against choosing to exercise her constitutionally protected right to an elective abortion. . . . Her choice is affected not simply by the absence of payment for the abortion, but by the availability of public funds for childbirth if she chooses not to have the abortion. When the state thus infringes upon a fundamental interest, it must assert a compelling state interest." *Roe* v. *Norton,* 408 F. Supp. 660, 663–664 (1975).

This Court reverses on the ground that "the District Court misconceived the nature and scope of the fundamental right recognized in *Roe* [v. *Wade,* 410 U. S. 113 (1973)]," *ante,* at 471, and therefore that Connecticut was not required to meet the "compelling interest" test to justify its discrimination against elective abortion but only "the less demanding test of rationality that applies in the absence of . . . the impingement of a fundamental right," *ante,* at 477, 478. This holding, the Court insists, "places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion"; she is still at liberty to finance the abortion from "private sources." *Ante,* at 474. True, "the State may [by funding childbirth] have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there." *Ibid.* True, also, indigency "may make it difficult—and in some cases,

perhaps impossible—for some women to have abortions," but that regrettable consequence "is neither created nor in any way affected by the Connecticut regulation." *Ibid.*

But a distressing insensitivity to the plight of impoverished pregnant women is inherent in the Court's analysis. The stark reality for too many, not just "some," indigent pregnant women is that indigency makes access to competent licensed physicians not merely "difficult" but "impossible." As a practical matter, many indigent women will feel they have no choice but to carry their pregnancies to term because the State will pay for the associated medical services, even though they would have chosen to have abortions if the State had also provided funds for that procedure, or indeed if the State had provided funds for neither procedure. This disparity in funding by the State clearly operates to coerce indigent pregnant women to bear children they would not otherwise choose to have, and just as clearly, this coercion can only operate upon the poor, who are uniquely the victims of this form of financial pressure. Mr. Justice Frankfurter's words are apt:

> "To sanction such a ruthless consequence, inevitably resulting from a money hurdle erected by the State, would justify a latter-day Anatole France to add one more item to his ironic comments on the 'majestic equality' of the law. 'The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread'. . . ." *Griffin* v. *Illinois,* 351 U. S. 12, 23 (1956) (concurring opinion).

None can take seriously the Court's assurance that its "conclusion signals no retreat from *Roe* [v. *Wade*] or the cases applying it," *ante,* at 475. That statement must occasion great surprise among the Courts of Appeals and District Courts that, relying upon *Roe* v. *Wade* and *Doe* v. *Bolton,* 410 U. S. 179 (1973), have held that States are constitutionally required to fund elective abortions if they fund pregnancies carried to

term.  See *Doe* v. *Rose,* 499 F. 2d 1112 (CA10 1974); *Wulff* v. *Singleton,* 508 F. 2d 1211 (CA8 1974), rev'd and remanded on other grounds, 428 U. S. 106 (1976); *Doe* v. *Westby,* 383 F. Supp. 1143 (WDSD 1974), vacated and remanded (in light of *Hagans* v. *Lavine,* 415 U. S. 528 (1974)), 420 U. S. 968, on remand, 402 F. Supp. 140 (1975); *Doe* v. *Wohlgemuth,* 376 F. Supp. 173 (WD Pa. 1974), aff'd on statutory grounds *sub nom. Doe* v. *Beal,* 523 F. 2d 611 (CA3 1975), rev'd and remanded, *ante,* p. 438; *Doe* v. *Rampton,* 366 F. Supp. 189 (Utah 1973); *Klein* v. *Nassau County Medical Center,* 347 F. Supp. 496 (EDNY 1972), vacated and remanded (in light of *Roe* v. *Wade* and *Doe* v. *Bolton,* 412 U. S. 925 (1973)), on remand, 409 F. Supp. 731 (1976).   Indeed, it cannot be gainsaid that today's decision seriously erodes the principles that *Roe* and *Doe* announced to guide the determination of what constitutes an unconstitutional infringement of the fundamental right of pregnant women to be free to decide whether to have an abortion.

The Court's premise is that only an equal protection claim is presented here.   Claims of interference with enjoyment of fundamental rights have, however, occupied a rather protean position in our constitutional jurisprudence.   Whether or not the Court's analysis may reasonably proceed under the Equal Protection Clause, the Court plainly errs in ignoring, as it does, the unanswerable argument of appellees, and the holding of the District Court, that the regulation unconstitutionally impinges upon their claim of privacy derived from the Due Process Clause.

*Roe* v. *Wade* and cases following it hold that an area of privacy invulnerable to the State's intrusion surrounds the decision of a pregnant woman whether or not to carry her pregnancy to term.   The Connecticut scheme clearly impinges upon that area of privacy by bringing financial pressures on indigent women that force them to bear children they would not otherwise have.   That is an obvious impairment of the

fundamental right established by *Roe* v. *Wade*. Yet the Court concludes that "the Connecticut regulation does not impinge upon [that] fundamental right." *Ante,* at 474. This conclusion is based on a perceived distinction, on the one hand, between the imposition of criminal penalties for the procurement of an abortion present in *Roe* v. *Wade* and *Doe* v. *Bolton* and the absolute prohibition present in *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976), and, on the other, the assertedly lesser inhibition imposed by the Connecticut scheme. *Ante,* at 472–474.

The last time our Brother POWELL espoused the concept in an abortion case that "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy," *ante,* at 475, the Court refused to adopt it. *Singleton* v. *Wulff,* 428 U. S. 106, 122 (1976). This was made explicit in Part II of our Brother BLACKMUN's opinion for four of us and is implicit in our Brother STEVENS' essential agreement with the analysis of Part II–B. *Id.,* at 121–122 (concurring in part). Part II–B stated:

> "MR. JUSTICE POWELL would so limit *Doe* and the other cases cited, explaining them as cases in which the State 'directly interfered with the abortion decision' and 'directly interdicted the normal functioning of the physician-patient relationship by criminalizing certain procedures,' [428 U. S.,] at 128. There is no support in the language of the cited cases for this distinction . . . . Moreover, a 'direct interference' or 'interdiction' test does not appear to be supported by precedent. . . . For a doctor who cannot afford to work for nothing, and a woman who cannot afford to pay him, the State's refusal to fund an abortion is as effective an 'interdiction' of it as would ever be necessary. Furthermore, since the right . . . is not simply the right to have an abortion, but the right to have abortions nondiscriminatorily funded,

the denial of such funding is as complete an 'interdiction' of the exercise of the right as could ever exist." *Id.,* at 118 n. 7.

We have also rejected this approach in other abortion cases. *Doe* v. *Bolton,* the companion to *Roe* v. *Wade,* in addition to striking down the Georgia criminal prohibition against elective abortions, struck down the procedural requirements of certification of hospitals, of approval by a hospital committee, and of concurrence in the abortion decision by two doctors other than the woman's own doctor. None of these requirements operated as an absolute bar to elective abortions in the manner of the criminal prohibitions present in the other aspect of the case or in *Roe,* but this was not sufficient to save them from unconstitutionality. In *Planned Parenthood, supra,* we struck down a requirement for spousal consent to an elective abortion which the Court characterizes today simply as an "absolute obstacle" to a woman's obtaining an abortion. *Ante,* at 473. But the obstacle was "absolute" only in the limited sense that a woman who was unable to persuade her spouse to agree to an elective abortion was prevented from obtaining one. Any woman whose husband agreed, or could be persuaded to agree, was free to obtain an abortion, and the State never imposed directly any prohibition of its own. This requirement was qualitatively different from the criminal statutes that the Court today says are comparable, but we nevertheless found it unconstitutional.

Most recently, also in a privacy case, the Court squarely reaffirmed that the right of privacy was fundamental, and that an infringement upon that right must be justified by a compelling state interest. *Carey* v. *Population Services International,* 431 U. S. 678 (1977). That case struck down in its entirety a New York law forbidding the sale of contraceptives to minors under 16 years old, limiting persons who could sell contraceptives to pharmacists, and forbidding ad-

vertisement and display of contraceptives. There was no New York law forbidding *use* of contraceptives by anyone, including minors under 16, and therefore no "absolute" prohibition against the exercise of the fundamental right. Nevertheless the statute was declared unconstitutional as a burden on the right to privacy. In words that apply fully to Connecticut's statute, and that could hardly be more explicit, *Carey* stated: " 'Compelling' is of course the key word; where a decision as fundamental as that whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." *Id.*, at 686. *Carey* relied specifically upon *Roe, Doe,* and *Planned Parenthood,* and interpreted them in a way flatly inconsistent with the Court's interpretation today: "The significance of these cases is that they establish that the same test must be applied to state regulations that burden an individual's right to decide to prevent conception or terminate pregnancy by substantially limiting access to the means of effectuating that decision as is applied to state statutes that prohibit the decision entirely." 431 U. S., at 688.

Finally, cases involving other fundamental rights also make clear that the Court's concept of what constitutes an impermissible infringement upon the fundamental right of a pregnant woman to choose to have an abortion makes new law. We have repeatedly found that infringements of fundamental rights are not limited to outright denials of those rights. First Amendment decisions have consistently held in a wide variety of contexts that the compelling-state-interest test is applicable not only to outright denials but also to restraints that make exercise of those rights more difficult. See, *e. g., Sherbert* v. *Verner,* 374 U. S. 398 (1963) (free exercise of religion); *NAACP* v. *Button,* 371 U. S. 415 (1963) (freedom of expression and association), *Linmark Associates* v. *Township of Willingboro,* 431 U. S. 85 (1977) (freedom of expres-

sion). The compelling-state-interest test has been applied in voting cases, even where only relatively small infringements upon voting power, such as dilution of voting strength caused by malapportionment, have been involved. See, *e. g., Reynolds* v. *Sims,* 377 U. S. 533, 562, 566 (1964); *Chapman* v. *Meier,* 420 U. S. 1 (1975); *Connor* v. *Finch,* 431 U. S. 407 (1977). Similarly, cases involving the right to travel have consistently held that statutes penalizing the fundamental right to travel must pass muster under the compelling-state-interest test, irrespective of whether the statutes actually deter travel. *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250, 257–258 (1974); *Dunn* v. *Blumstein,* 405 U. S. 330, 339–341 (1972); *Shapiro* v. *Thompson,* 394 U. S. 618 (1969). And indigents asserting a fundamental right of access to the courts have been excused payment of entry costs without being required first to show that their indigency was an absolute bar to access. *Griffin* v. *Illinois,* 351 U. S. 12 (1956); *Douglas* v. *California,* 372 U. S. 353 (1963); *Boddie* v. *Connecticut,* 401 U. S. 371 (1971).

Until today, I had not thought the nature of the fundamental right established in *Roe* was open to question, let alone susceptible of the interpretation advanced by the Court. The fact that the Connecticut scheme may not operate as an absolute bar preventing all indigent women from having abortions is not critical. What is critical is that the State has inhibited their fundamental right to make that choice free from state interference.

Nor does the manner in which Connecticut has burdened the right freely to choose to have an abortion save its Medicaid program. The Connecticut scheme cannot be distinguished from other grants and withholdings of financial benefits that we have held unconstitutionally burdened a fundamental right. *Sherbert* v. *Verner, supra,* struck down a South Carolina statute that denied unemployment compensation to a woman who for religious reasons could not

work on Saturday, but that would have provided such compensation if her unemployment had stemmed from a number of other nonreligious causes. Even though there was no proof of indigency in that case, *Sherbert* held that "the pressure upon her to forgo [her religious] practice [was] unmistakable," 374 U. S., at 404, and therefore held that the effect was the same as a fine imposed for Saturday worship. Here, though the burden is upon the right to privacy derived from the Due Process Clause and not upon freedom of religion under the Free Exercise Clause of the First Amendment, the governing principle is the same, for Connecticut grants and withholds financial benefits in a manner that discourages significantly the exercise of a fundamental constitutional right. Indeed, the case for application of the principle actually is stronger than in *Verner* since appellees are all indigents and therefore even more vulnerable to the financial pressures imposed by the Connecticut regulation.

*Bellotti* v. *Baird,* 428 U. S. 132, 147 (1976), held, and the Court today agrees, *ante,* at 473, that a state requirement is unconstitutional if it "unduly burdens the right to seek an abortion." Connecticut has "unduly" burdened the fundamental right of pregnant women to be free to choose to have an abortion because the State has advanced no compelling state interest to justify its interference in that choice.

Although appellant does not argue it as justification, the Court concludes that the State's interest "in protecting the potential life of the fetus" suffices, *ante,* at 478.* Since only the first trimester of pregnancy is involved in this case, that justification is totally foreclosed if the Court is not overruling

---

*The Court also suggests, *ante,* at 478 n. 11, that a "State may have legitimate demographic concerns about its rate of population growth" which might justify a choice to favor live births over abortions. While it is conceivable that under some circumstances this might be an appropriate factor to be considered as part of a State's "compelling" interest, no one contends that this is the case here, or indeed that Connecticut has any demographic concerns at all about the rate of its population growth.

the holding of *Roe* v. *Wade* that "[w]ith respect to the State's important and legitimate interest in potential life, the 'compelling' point is at viability," occurring at about the end of the second trimester. 410 U. S., at 163. The appellant also argues a further justification not relied upon by the Court, namely, that the State needs "to control the amount of its limited public funds which will be allocated to its public welfare budget." Brief for Appellant 22. The District Court correctly held, however, that the asserted interest was "wholly chimerical" because the "state's assertion that it saves money when it declines to pay the cost of a welfare mother's abortion is simply contrary to undisputed facts." 408 F. Supp., at 664.

Finally, the reasons that render the Connecticut regulation unconstitutional also render invalid, in my view, the requirement of a prior written certification by the woman's attending physician that the abortion is "medically necessary," and the requirement that the hospital submit a Request for Authorization of Professional Services including a "statement indicating the medical need for the abortion." Brief for Appellees 2–3. For the same reasons, I would also strike down the requirement for prior authorization of payment by the Connecticut Department of Social Services.