Jane E. HODGSON, M. D., Allen W. Delzell, M. D., and all others similarly situated, Plaintiffs,

v.

Gary W. FLAKNE, Hennepin County Attorney, William B. Randall, Ramsey County Attorney, Warren Spannaus, Attorney General for the State of Minnesota, Warren Lawson, Commissioner of Health of the State Department of Health and Executive Secretary of the State Board of Health, their agents, assigns, successors, representatives, and those acting in concert with them, and all others similarly situated, Defendants.

Civ. No. 4–76–293.

United States District Court, D. Minnesota, Fourth Division.

Nov. 30, 1978.

Roy Lucas, Washington, D. C., Maynard E. Pirsig, and Gary B. Crawford, Minneapolis, Minn., for plaintiffs.

Gary W. Flakne, Hennepin County Atty. and David A. Olson, Asst. Hennepin County Atty., Minneapolis, Minn., for defendant Flakne.

William B. Randall, Ramsey County Atty., St. Paul, Minn., for defendant Randall.

Warren R. Spannaus, Atty. Gen., and Thomas H. Jensen, Sp. Asst. Atty. Gen., St. Paul, Minn., for defendant Attorney General and State of Minnesota.

## MEMORANDUM and ORDER

Before HEANEY, Circuit Judge, DEVITT, Chief District Judge, and LORD, District Judge.

### DEVITT, Chief District Judge.

This declaratory judgment action is brought by two medical doctors, as class representatives, against the Minnesota Attorney General and two Minnesota County Attorneys to determine the constitutionality of a 1976 Minnesota law regulating abortions. This Memorandum and Order is in response to cross motions for summary judgment. The statute, Minn.Stat. § 145.-423(2), reads:

> When an abortion is performed after the twentieth week of pregnancy, a physician, other than the physician performing the abortion, shall be immediately accessible to take all reasonable measures consistent with good medical practice, including the compilation of appropriate medical records, to preserve the life and health of any live birth that is the result of the abortion.

■ Because there are fact issues involved that require an evidentiary hearing, we find the summary judgment procedure inappropriate and deny the summary judgment motions. Moreover, the court abstains from proceeding further and leaves the parties to resort to the Minnesota state courts, since the state statute at issue has not been previously construed by the state courts and is subject to a construction that might well avoid the necessity for federal constitutional adjudication. See *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976).

The question whether summary judgment is proper depends in large measure upon the continuing vitality of the standards set forth in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In that landmark decision the Supreme Court held that abortions cannot be regulated prior to when the fetus becomes viable, if the purpose of the regulation is to protect the potential life of the fetus. The statute at issue in this case clearly regulates prior to viability; it requires a second doctor to be present for all abortions after the twentieth week, even though viability almost never occurs before the twenty-fourth week. In addition, the only apparent purpose of the statute is to protect the potential life of the fetus. Thus, under *Roe v. Wade* the statute would be unconstitutional on its face and summary judgment for the plaintiffs would be appropriate.

The standards set forth in *Roe v. Wade*, however, appear to have been altered by the Supreme Court in the recent case of *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). In *Maher* the Court ruled that only "unduly burdensome" or "substantial" regulations of abortions prior to viability are constitutionally infirm.[1]

1. *Maher* is factually dissimilar to the present case since it involved welfare funding of abortions. The Court ruled that the state regulation forbidding such funding was not unduly burdensome since it imposed only an indirect restraint upon the abortion decision. 97 S.Ct. at 2383. One therefore could argue that *Maher* only applies to indirect restrictions and that direct restrictions prior to viability to protect the fetus are always unconstitutional under *Roe v. Wade*. Because the present case involves a "direct" regulation of abortions, *Maher* thus could be read as requiring a finding that the statute is unconstitutional as a matter of law. A fair reading of *Maher*, however, leaves little doubt that the Court did not intend to imply that all direct restrictions are per se unconstitutional. For example, the Court emphasized that the statute in *Roe v. Wade* was invalid, not because it imposed a direct restriction upon abortions, but because the restriction was so "substantial" and "severe" as to be unduly burdensome. *Id.* at 2381–82. Thus, it appears that whether the regulation is direct or

The fact that the statute in the present case regulates prior to viability therefore is not dispositive; the burdensomeness of the regulation also must be determined. This determination, in the court's opinion, requires an evidentiary hearing. For example, the logic of the twenty week cutoff date must be explored. Defendants suggest it is logical because a margin of error as to the date of conception of four to six weeks is possible, meaning that a fetus believed to be twenty weeks old might in fact be twenty-four to twenty-six weeks old, bringing it within the age of potential viability. The factual soundness of this argument must be substantiated. Also, evidence is needed as to the benefit of having a second doctor present—can the attending physician and his or her medical assistants adequately protect the health of any viable birth resulting from the abortion? Other necessary evidence relates to the burden placed upon the woman by the statute. What is the additional expense to the woman? Does the requirement of a second doctor, with the implicit suggestion that a live birth might result, increase the trauma of the abortion? Does the requirement make abortions less accessible for women in rural areas? Will the presence of a second doctor interfere with the abortion operation? To what extent does the statutory requirement conflict with existing medical practice? These questions and others must be answered before the burdensomeness of the statute can be determined.

The burdensomeness of the statute also is affected by the construction given it. Two major problems of statutory construction influence the determination of whether the statute creates unduly burdensome restrictions upon the woman's right to abort prior to viability. The first concerns the meaning of the term "live birth." The statute requires the second doctor to attempt to save the life of any "live birth." Plaintiffs claim the term is not synonymous with "vi-

ability," since viability implies the ability to survive. Defendants, on the other hand, argue that the two terms are synonymous. The interpretation given the term "live birth" is important because if it is interpreted as not being synonymous with viability, then the statute imposes an additional burden prior to viability; it requires the second doctor to attempt to save the life of any live fetus, even if not viable. Therefore, the burdensomeness of the statute prior to viability may be significantly influenced by the construction given the term "live birth."

The second problem of statutory construction concerns the applicability of sanctions. Section 145.423(1) contains no explicit enforcement mechanism and the parties are in dispute as to which, if any, of the general statutory enforcement procedures apply. Plaintiffs, for example, claim that violation of the statute by a doctor results in criminal liability under Minn.Stat. § 645.-241, while defendants claim otherwise. Resolution of the enforcement issue is significant because the statute is more burdensome if it subjects the doctor to potential criminal liability. *See Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 2384, 53 L.Ed.2d 484 (1977).

 Because § 145.423 is subject to varying interpretations which could affect its burdensomeness, the question arises whether this court should abstain and allow the state courts to construe the statute. The resolution of this question, we think, is controlled by the Supreme Court decision of *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 35 L.Ed.2d 147 (1976). *Bellotti*, like the present case, involved a state law that regulated abortions. The parties were in dispute as to the meaning of the law, and the interpretation given the statute affected its burdensomeness on the woman's right to abort. As a consequence, the Court held that abstention was required. The Court

---

indirect is but one factor relevant to the determination of the statute's burdensomeness. This conclusion is reinforced by *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). In that case the state abortion

statute at issue imposed a direct restriction but the Court refused to hold it unduly burdensome as a matter of law. *Id.* at 147–48, 96 S.Ct. 2857.

set forth the following standard for determining the propriety of abstaining: "abstention is appropriate where an unconstrued state statute is susceptible of a construction by the state judiciary 'which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.'" *Id.* at 146–47, 96 S.Ct. at 2866. (quoting *Harrison v. NAACP*, 360 U.S. 167, 177, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959)). Applying this standard, we are convinced that abstention is proper. The two issues of statutory interpretation noted above, depending upon their resolution, obviously "materially change the nature of the problem." Construed one way, the statute might well be unduly burdensome and therefore unconstitutional, while construed another way it might be valid. Abstention therefore is proper and we defer to the state courts to construe the pertinent state statutes and to hold any necessary evidentiary hearings concerning the burdensomeness of the statute.

The cross-motions for summary judgment are DENIED. The court stays its hand and leaves the parties to resort to the Minnesota state court system for interpretation of this state statute.

MILES W. LORD, District Judge, concurring in part and dissenting in part.

I concur in the result of denying summary judgment, although I disagree with the majority's characterization of the statute.

The challenged regulation requires that an attending physician be "immediately accessible" at any abortion conducted after twenty weeks of pregnancy. Although viability is generally regarded to occur no sooner than twenty-four weeks, *Roe v. Wade*, 410 U.S. 113, 160, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the twenty-week standard in the statute is based on the assumption that an error can occur when gestation is calculated, thus making it possible that a fetus believed to be twenty weeks could, in fact, be twenty-four weeks, and viable. Thus, the state seeks to protect by this unique statute every fetus that might possibly be viable, taking into account even the gestation miscalculation. The question here is to what extent the regulation places a burden on the woman's right to privacy and whether any such burden is unconstitutional. In analyzing the propriety of summary judgment, the majority oversimplifies the statute's operation.

The majority characterizes this statute as one that "clearly regulates [the abortion process] prior to viability," (Majority opinion, p. 68), but the statute is not so clear. The statute clearly applies at twenty weeks, but if the fetus is older than originally estimated, the fetus could be viable, and the statute would not be imposing any requirements prior to viability. The possibility of an error in calculating fetal age makes the constitutional question much more complicated than the majority indicates. Evidentiary hearings would establish how reasonable the twenty week standard is and how frequently a viable fetus could be thought to be only of twenty weeks gestation. If such evidence is forthcoming, the question under *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), becomes, not as the majority states, whether the state can regulate abortion *prior to* viability for the purpose of protecting the fetus, but whether the state can burden the abortion process in this particular manner in order to protect its interest in the occasional viable fetus. The constitutionality of the statute is then gauged by the two-tier test of (1) is a burden presented to the privacy right to seek and obtain an abortion, and (2) if so, is the burden "undue," i. e., might the statute be more "narrowly drawn to express only the legitimate state interests at stake." *Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973).[1]

---

1. The majority suggests that the concept of "undue" burden was initially introduced in *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), as a *modification* of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d

147 (1973). The "undue" burden is implicit in the *Roe v. Wade* requirement that burdens be narrowly drawn. 410 U.S. at 155, 93 S.Ct. 705. It has long been the case that where fundamental rights were involved the state could only

Since *Roe v. Wade* permits the state to regulate and even proscribe abortion after viability, *Roe v. Wade,* at 164–65, 93 S.Ct. 705, and subsequent decisions indicate that prior to viability state-imposed requirements affecting the abortion process may be permissible if not unduly burdensome, *Bellotti v. Baird,* 428 U.S. 132, 145–150, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Planned Parenthood v. Danforth,* 428 U.S. 52, 65–66, 80–81, 98 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Hodgson v. Lawson,* 542 F.2d 1350, 1357 (8th Cir. 1976), the constitutionality of the statute becomes wholly a question of the presence, and extent of, and justification for, any burden imposed. Because these questions involve factual determinations and cannot be resolved from the face of the statute, we should require an evidentiary hearing. To determine the *extent* of the burden, I would add the inquiries (1) whether the fetus would be amply protected by leaving to the aborting physician the decision to call in a second doctor, and (2) whether a reliable determination of fetal viability or non-viability can be made by the attending physician prior to the abortion.

I respectfully dissent on two grounds to the treatment of the abstention issue.

## I. WHETHER TO ABSTAIN

The majority abstains from this case because the statute has not been interpreted as to (1) the enforcement sanctions, and (2) the meaning of the term "live birth," citing *Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). Both issues are improper bases for abstention.

To justify abstention under *Bellotti,* an issue of construction must either avoid the necessity for hearing the constitutional claim or materially change the nature of the problem. *Bellotti* at 147, 96 S.Ct. 2857. Legislation of this type is either constitu-

tional or unconstitutional depending on the burden it places on the woman seeking the abortion and any justification for the burden. The burden could take many forms: emotional, psychological, physical, economic, or geographic inconvenience. It is also possible that legislation could create such a maze of technical requirements and paperwork so as to create a practical if not a legal impediment to the abortion process. *Danforth* at 81, 98 S.Ct. 2831. It is difficult for me to ascertain how state court construction of the term "live birth" or construction of the enforcement provisions in any way affects the question to which we must address ourselves, which is: What does this legislation do to inhibit the woman's decision to have an abortion or the abortion process itself.

## A. ENFORCEMENT SANCTIONS

We must assume that all citizens will obey the law. If the statute requires that a second doctor be "immediately accessible," the medical profession will comply. A woman seeking an abortion in Minnesota after her twentieth week of pregnancy can expect to have a second doctor "immediately accessible."

Whether the plaintiff physicians face civil or criminal penalty for violating the statute relates to their standing to bring suit, but not to the burden on the woman's privacy right. What might happen to the doctors for not complying tells us nothing about the burden to the woman's privacy right if the doctors comply. Our inquiry should resolve how obeying the statute burdens the woman rather than how disobeying it burdens the physicians. The burden to the woman comes from the duties imposed by the statute itself, not from the sanctions enforcing those duties. Penalties acting against the doctors are matters of standing which do

regulate based on a compelling state interest, and could burden the right only to the extent justified by the compelling state interest. Any burden imposed by statute is "undue" to the extent that the statute could be more narrowly drawn to reduce that burden and still protect the compelling state interest. See the cases cited in *Roe* at 155, 93 S.Ct. 705. Even if the

"undue" burden concept was introduced by a case after *Roe,* that case would be *Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976), where the same language appears. *Bellotti* at 147, 96 S.Ct. 2857. In fact, *Maher* quotes this language from *Bellotti,* 432 U.S. 473, 96 S.Ct. 2857, 49 L.Ed.2d 844.

not affect the burden to the woman's fundamental privacy right. See, *Planned Parenthood v. Danforth*, 428 U.S. 52, 83, 98 S.Ct. 2831, 49 L.Ed.2d 788 (1976).

### B. "LIVE BIRTH" ·

The majority seeks state court construction of the term "live birth," maintaining that under one construction of this phrase, the second doctor will attend to a viable fetus and under another construction, the doctor will attend a non-viable fetus that shows signs of life. The majority finds significance in this, because if the statute requires the doctor to attempt to save the life of a non-viable fetus it is claimed that the statute regulates prior to viability. (Majority opinion, pp. 68–69). I have difficulty understanding just how these constructions might relate to the woman's privacy right. Once the statute requires a second doctor to be "immediately accessible," the burden has already been imposed. Whether the fetus happens to be viable or non-viable neither subtracts from nor adds to the burden to the woman.[2]

The basic requirement that a second doctor must be accessible for abortions after the twentieth week will in no way be altered by statutory construction of "live birth."

Our constitutional concern is the emotional, psychological, physical, economic or geographic burdens the second doctor requirement presents to the abortion decision and the abortion itself. Neither issue of statutory construction relates to the burden on the woman's privacy right, neither relates to the constitutional question presented, and neither is a basis for abstention.

## II. CERTIFICATION

The practical effect of the majority decision to abstain is that this litigation must begin anew at the trial court level in the state courts, thereby increasing the expense and delaying the ultimate resolution of the controversy. Assuming abstention is appro-

priate, an alternative procedure is available but not followed by the majority. The two issues of statutory construction could be certified to the Minnesota Supreme Court pursuant to the Uniform Certification of Questions of Law Act, Minn.Stat.Ann. § 480.061 (West Supp. 1977). As the Minnesota Supreme Court was ruling on the certified questions the factual hearings necessary to resolve the questions previously referred to could proceed in this court, substantially expediting the final resolution of this important question. *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976), requires this approach if abstention is appropriate. In *Bellotti*, the State of Massachusetts had also adopted the Uniform Certification of Questions of Law Act, Mass.Rules of Ct., Sup.Jud.Ct.Rule 3:21 (1976). The *Bellotti* case stated:

> The importance of speed in resolution of the instant litigation is manifest. Each day the statute is in effect, irretrievable events, with substantial personal consequences, occur.

> We therefore hold that *the District Court should have certified to the Supreme Judicial Court of Massachusetts appropriate questions concerning the meaning of [the statute].*

*Id.* at 151, 96 S.Ct. at 2868 (emphasis added). Because fundamental privacy rights are involved, if abstention were appropriate, I would certify legitimate questions of construction for prompt resolution by the Minnesota Supreme Court.

## III. CONCLUSION

In conclusion, without ruling on the merits of the claim, I agree that summary judgment should be denied because there are a number of factual issues in dispute. All parties should be given an opportunity to present evidence supporting their claims at a full hearing before the Court.

I disagree in the determination that it is proper for the Federal Court to refuse to decide the issues and I dissent from that

---

**2.** The statute imposes on the physician only "reasonable measures consistent with good medical practice" to preserve the live birth.

Thus the status of the fetus as viable or non-viable does not control the actions taken by the physician.

portion of the Majority Opinion dealing with abstention. Statutory construction by the state court cannot avoid or materially change the nature of the constitutional issues raised. Furthermore, if abstention were appropriate to expedite the final resolution of these issues involving fundamental rights and to comply with the United States Supreme Court decision in *Bellotti v. Baird,* I would certify the questions of statutory construction directly to the Minnesota Supreme Court.