Margaret Rivera, Chairperson State Employees and Officials Group Insurance Board 706 State Services Building Denver, CO 80203
Dear Ms. Rivera:
This opinion letter is in response to your October 15, 1984 request for advice concerning the effect of the constitutional amendment prohibiting the use of "public funds" for induced abortions on health insurance coverage provided by the state to its employees.
QUESTIONS PRESENTED AND CONCLUSIONS
Your inquiry raises the following issues:
1. Whether the amendment applies to and prohibits the inclusion of induced abortion coverage in health insurance benefits provided by the state to its employees?
My conclusion is that it does.
2. Whether the amendment can, consistent with federal constitutional principles, so limit the health insurance coverage provided by the state to its employees?
My conclusion is "yes."
ANALYSIS
1. Group health insurance is provided to employees of the State of Colorado under the "State Employees and Officials Group Health Insurance Act" (the "Act"), sections 10-8-201 through 10-8-218, C.R.S. (1973 and 1984 Supp.). The state health insurance programs are administered and managed by a statutorily created board of administration (the "SEOGI Board") comprised of various state officials or their designees and elected employee representatives. Sections 10-8-204 and 10-8-205, C.R.S. (1984 Supp.). The cost of providing employee group health insurance comes from employee payroll deductions, section 10-8-212, C.R.S. (1984 Supp.), and state employer contributions, section 10-8-211, C.R.S. (1984 Supp.). The employee payroll deductions and employer contributions are deposited into the group insurance reserve fund established by section 10-8-215, C.R.S. (1984 Supp.) and administered by the SEOGI Board, section 10-8-205(1)(g), C.R.S. (1984 Supp.). From the group insurance reserve fund expenditures are made for the purpose of paying insurance carrier premiums and the state's cost of administering the insurance plans. Section 10-8-215, C.R.S. (1984). State employees receive health care benefits through certain health maintenance organizations ("HMOs") or through the self-funded group health insurance program.
The amendment states, in part, that "no public funds shall be used by the State of Colorado, its agencies or political subdivisions to pay or otherwise reimburse, either directly or indirectly, any person, agency or facility for the performance of any induced abortion. . . ." Given the broad language of the amendment and the method of financing and administering state employee health insurance programs, the inclusion of coverage for induced abortions in the health care benefits provided by the state to its employees appears to be proscribed. "Public funds," within the meaning of the constitutional amendment, are involved in the monthly employer contribution toward the cost of providing employee health insurance coverage. The payments made by the state as employer originate in the general revenue fund accounts and specific cash fund accounts of the various state departments, agencies and institutions. Section 10-8-216, C.R.S. (1984 Supp.). Such contributions are public moneys earmarked for a particular purpose, not payments to employees or over which such employees have any direct claim. See section11-10.5-103(12), C.R.S. (1984 Supp.).[1]
In addition, the fund into which such contributions are deposited and from which state employee health insurance benefits are provided can itself be characterized as a "public fund." Although moneys in the group insurance reserve fund are not general revenues of the state, do not, at year-end revert to the state's general fund, and are held by the state treasurer in his custodial capacity, section 10-8-215(1), C.R.S. (1984 Supp.), the fund is controlled by the statutorily created SEOGI Board and is subject to annual appropriation by the general assembly. Section 10-8-215(2)(b), C.R.S. (1984 Supp.).[2]
If the state, as employer, provides health insurance coverage for induced abortions, payments for medical claims relating thereto would be in violation of the amendment. The amendment prohibits the use of public funds for both direct and indirect payments to or reimbursement of persons, agencies or facilities performing abortions. In the case of an employee covered by the state's self-insured group health insurance plan, payments or reimbursement for the abortion procedures would be made directly from the group insurance reserve fund to the provider of the medical service. In the case of an employee covered by an HMO, the link to public funds is indirect. Premiums are paid by the state to the HMO which, in turn, pays the medical provider. Although the funds used to pay or reimburse such provider would not be directly traceable to the group insurance reserve fund or the state contributions deposited therein, "indirect" use of public funds for abortions is specifically prohibited by the amendment. Payments from an HMO to pay or reimburse a provider of abortion procedures could be considered indirectly linked to the public funds paid as a premium to the HMO.[3]
2. The passage of the initiated constitutional amendment at the November general election does not insure its validity under the United States Constitution. The initiative process does not give the people of the state the power to adopt a state constitutional amendment which violates the federal constitution.Lucas v. Forty-Fourth General Assembly, 377 U.S. 713
(1964). It is my opinion, however, that the amendment could withstand constitutional scrutiny under the United States Supreme Court cases concerning public funding of abortions. The supreme court has established the principle that the state need not commit public funds to abortion and may, as a matter of policy, enact legislation which favors childbirth over abortion.See Harris v. McRae, 448 U.S. 297 (1980); Maher v.Roe, 432 U.S. 464 (1977). In Maher the supreme court upheld a Connecticut regulation which denied state medicaid payments for nontherapeutic abortions. The regulation survived 14th amendment equal protection clause scrutiny because the regulation did not affect a suspect class (indigency not constituting such a class), id. at 470-471, and did not unduly interfere with or burden a woman's freedom to decide to terminate pregnancy. Id. at 474.[4] The medicaid funding restriction was found to be rationally related to the legitimate state goal of favoring childbirth over abortion. Key to the supreme court's decision in Maher
is the court's conclusion that the funding restriction did not impinge on a fundamental right. The court distinguished between state interference with a protected activity and state encouragement of alternative activity, stating that there is "(n)o limitation on the authority of a state to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." Id. at 474. Following the same analysis, the supreme court 3 years later in Harris v. McRae found the Hyde amendment, which imposed similar restrictions on the use of federal funds to reimburse the costs of abortions under the medicaid program, to be constitutional.[5]
The initiated constitutional amendment is essentially a public funding measure and its limitation on the state's ability to provide health insurance benefits to its employees for induced abortions could be upheld under the foregoing analysis as rationally related to the furtherance of the legitimate state goal of favoring childbirth over abortion.[6]
SUMMARY
Given the broad restrictions on the use of public funds for induced abortions contained in the initiated constitutional amendment and the manner in which state employee health insurance programs are financed and administered, coverage for induced abortions may not, consistent with such amendment, be included in the insurance provided by the state to its employees. Such restriction appears to be a constitutionally permissible public funding measure under applicable United States Supreme Court decisions.
Very truly yours,
 DUANE WOODARD Attorney General
ABORTION CONSTITUTIONAL AMENDMENTS EMPLOYEES, PUBLIC INSURANCE PUBLIC FUNDS
Colo. Const. art. IV
ADMINISTRATION, DEPT. OF
The constitutional amendment proscribing the public funding of abortions prevents the state from providing employee health insurance coverage for abortions.
[1] Enrollment in state health insurance programs is subject to employee election. See sections 10-8-209 and 10-8-210, C.R.S. (1984 Supp.). Monthly state contributions are made on behalf of enrolled employees only and a nonenrolled employee has no claim to such contribution. Section 10-8-211, C.R.S. (1984 Supp.).
[2] Colorado cases involving the definition of a "public fund" are not particularly helpful in determining whether the group insurance reserve fund is a "public fund" for the purposes of the constitutional amendment. The phrase "public funds" in the amendment applies not only to the state and its agencies, but to its political subdivisions as well. The apparent intent of the amendment was to eliminate all public involvement in the financing of induced abortions. "Public funds," in that context must, therefore, be given a broader reading than that given in Colorado cases interpreting such phrase in other contexts.E.g., Stong v. IndustrialCommission, 71 Colo. 133, 204 P. 892 (1922);Pensioners Protective Association v. Davis,112 Colo. 535, 150 P.2d 974 (1944).
[3] The United States Supreme Court recently found indirect federal aid sufficient to subject a city college to the requirements of title IX of the Civil Rights Act in federal financial aid provided directly to some of its students. Such holding was in spite of the fact that the applicable statutory language did not specify that "indirect" federal assistance would subject the college to such provisions and in spite of the consistent refusal of the college, a private coeducational liberal arts college, to accept direct federal assistance or otherwise participate in programs which would subject it to federal control. Grove City College v. Bell,104 S.Ct. 1211 (1984).
[4] The supreme court, in Roe v. Wade, 410 U.S. 113
(1973), held that the fourteenth amendment's concept of personal liberty provided constitutional protection from state interference with a woman's decision to terminate her pregnancy.Id. at 153.
[5] The initiated amendment, which prohibits the use of public funds for all induced abortions, appears to conflict with42 U.S.C. § 2000e(k). That federal statute, applicable to the state as an employer, could be read as requiring the state, at a minimum, to provide abortion insurance coverage "where the life of the mother would be endangered if the fetus were carried to term, or . . . where medical complications have arisen from an abortion." The imposition of such a requirement upon the state would be inconsistent with the Harris v. McRae
analysis, however. In McRae the court refused to distinguish between nontherapeutic and medically necessary abortions in the public funding context. 448 U.S. at 415-416.
[6] The United States District Court for the District of Rhode Island recently struck down various state statutory provisions affecting insurance coverage for abortions. NationalEducation Association of Rhode Island v. Garrahy, Civil Action Nos. 82-90388 and 83-0406. At issue there, however, were statutory provisions which (1) had the effect of interfering generally with a woman's right to insure against the risks of abortion and (2) involved an attempt by the state legislature to control the insurance coverage made available by separate political entities to their respective employees. The court and all the parties acknowledged that the state could, if it desired, refuse to provide abortion benefits to its own employees.