# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2951

_____

| | | |
|---|---|---|
| Planned Parenthood of Mid-Missouri and Eastern Kansas, Inc., | * | |
| | * | |
| | * | |
| Plaintiff/Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Maureen Dempsey, Director of the Department of Health of the State of Missouri, | * | Appeal from the United States District Court for the Western District of Missouri. |
| | * | |
| | * | |
| | * | |
| Defendant/Appellee, | * | |
| | * | |
| John Doe, 1 thru 99, employees of the State of Missouri, | * | |
| | * | |
| | * | |
| Defendant, | * | |
| | * | |
| State of Missouri, | * | |
| | * | |
| Intervenor Defendant/ Appellant. | * | |
| | * | |

_____

Submitted: October 22, 1998

Filed: February 3, 1999

_____

Before WOLLMAN, BRIGHT, and HANSEN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

The State of Missouri appeals from the district court's grant of preliminary and permanent injunctions against the enforcement of section 10.715 of the Missouri code, which prevents abortion service providers from receiving state family-planning funds. We vacate the injunctions and remand with directions.

**I.**

Missouri appropriates funds to assist low-income residents with family planning. As a qualified family-planning service provider, Planned Parenthood has received funds since this program began in 1993. It provides both family-planning and abortion services, sometimes using the same facilities and marketing materials for both services. Until 1996, Planned Parenthood was allowed to receive program funds because it maintained accounting procedures that assured the State that no family-planning funds were spent on abortion services.

In 1996, however, the Missouri legislature decided to prohibit organizations that provide abortion services from receiving family-planning funds. According to the State, abortion service providers like Planned Parenthood were receiving indirect benefits from family-planning funds through shared revenue, marketing expenses, and fixed expenses, and through the "imprimatur of the state." Believing that these benefits contradicted Missouri's policy of encouraging childbirth over abortion, the Missouri legislature enacted statutes for fiscal years 1996 and 1998 that attempted to prohibit abortion service providers from receiving funds. These statutes were held to be unconstitutional by the district court, decisions which the State did not appeal. Instead, for fiscal year 1999 the Missouri legislature devised the three-tiered approach that is at issue in this case. See H.B. 1010, § 10.715, 89th Leg., 2d Sess. (Mo. 1998).

Tier I of section 10.715 prohibits family-planning funds from being used to perform, assist, encourage, or make direct referrals for abortions. In addition, it provides that organizations or affiliates of organizations that "provide or promote abortions" are not eligible for family-planning funds. Id.

Tier II takes effect only if Tier I is found unconstitutional. It provides funds only to organizations that qualify under specified state and federal statutes. Tier III takes effect only if both Tiers I and II are found unconstitutional. It provides family-planning funds only to the Missouri Department of Health and its subagencies. Planned Parenthood would not qualify for funds under Tier II or Tier III.

Planned Parenthood brought the present action to enjoin the enforcement of section 10.715. It claimed that the statute placed an unconstitutional condition on the receipt of state funds, violated the Equal Protection Clause, and constituted a bill of attainder. The district court found that the entire three-tiered scheme violated the Equal Protection Clause and declined to discuss the other grounds for the challenge.

## II.

We review de novo the constitutionality of a statute. See United States v. McMasters, 90 F.3d 1394, 1397 (8th Cir. 1996), cert. denied, 117 S. Ct. 783 (1997). The starting point in statutory interpretation is always the plain language of the statute itself. See United States v. S.A., 129 F.3d 995, 998 (8th Cir. 1997), cert. denied, 118 S. Ct. 1200 (1998). When language is ambiguous, however, and "an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems," unless such a construction is plainly contrary to legislative intent. Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988) (citing NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 499-501, 504 (1979)). The ultimate question is whether the statute "can be construed in such a manner that [it] can be applied . . .

-3-

without infringing upon constitutionally protected rights." <u>Rust v. Sullivan</u>, 500 U.S. 173, 183 (1991).

## A.  Unconstitutional Conditions

Neither Congress nor the states may condition the granting of government funds on the forfeiture of constitutional rights.  <u>See</u> <u>Speiser v. Randall</u>, 357 U.S. 513, 518-19 (1958) (holding unconstitutional the denial of a tax exemption based on the content of claimant's speech); <u>Shapiro v. Thompson</u>, 394 U.S. 618, 634-35 (1969) (finding residency requirements for welfare benefits unconstitutional as an infringement on the right to travel); <u>Perry v. Sindermann</u>, 408 U.S. 593, 597 (1972) (holding that although a person has no "right" to noncontractual government benefits, it is unconstitutional to deny such benefits in a way that interferes with constitutional rights).  As a result, funding classifications that interfere with the exercise of constitutional rights must be "necessary to promote a <u>compelling</u> governmental interest."  <u>Shapiro</u>, 394 U.S. at 634; <u>see also</u> <u>Speiser</u>, 357 U.S. at 529.

Not all funding classifications, however, can be said to actually interfere with constitutional rights.  <u>See</u> <u>Rust</u>, 500 U.S. at 196-98; <u>Webster v. Reproductive Health Servs.</u>, 492 U.S. 490, 509-10 (1989).  A refusal to fund the exercise of a constitutional right, without more, is not an infringement on that right.  <u>See</u> <u>Rust</u>, 500 U.S. at 193; <u>Harris v. McRae</u>, 448 U.S. 297, 316-18 (1980); <u>Maher v. Roe</u>, 432 U.S. 464, 474-75 (1977).  Generally, states may fund programs they believe are beneficial to the public to the exclusion of alternative programs.  <u>Rust</u>, 500 U.S. at 193.  Therefore, a state may validly choose to fund family-planning services but not abortion services.  <u>See</u> <u>id.</u> at 192-93; <u>Webster</u>, 492 U.S. at 509; <u>McRae</u>, 448 U.S. at 316-17.  As the Court held in <u>Maher</u>, the constitutional right of a woman to an abortion "implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds."  432 U.S. at 474.

The Supreme Court has attempted to demarcate a line, past which funding conditions constitute too great an interference with the exercise of fundamental rights to be deemed constitutional. In Maher, the Court held that states are not required to fund abortions. The Court went on to indicate, however, that a state's denial of all welfare benefits to otherwise qualified women who choose to have abortions might well be subject to strict scrutiny review. 432 U.S. at 474 n.8. In McRae, the Court analogized the denial of welfare benefits for women who have abortions to the denial of unemployment benefits for people who refuse to work on the Sabbath, which is clearly unconstitutional. See 448 U.S. at 317 n.19 (citing Sherbert v. Verner, 374 U.S. 398, 403-04 (1963)). "A substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate exercised her constitutionally protected freedom to terminate her pregnancy by abortion." Id.

In Rust, the Supreme Court spoke more directly about the line between constitutional and unconstitutional funding conditions. See 500 U.S. at 196-98. Legislation that simply dictates the proper scope of government-funded programs is constitutional, while legislation that restricts protected grantee activities outside government programs is unconstitutional:

> Title X expressly distinguishes between a Title X grantee and a Title X project. . . . The regulations govern the scope of the Title X project's activities, and leave the grantee unfettered in its other activities. The Title X grantee can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it simply is required to conduct those activities through programs that are separate and independent from the project that receives Title X funds.

Id. at 196. The regulations found constitutional in Rust required abortion activities to be "physically and financially separate" from government-funded projects. Id. at 180-81.

The Supreme Court has addressed the degree of independence that funding conditions may require of grantees' privately funded, protected conduct in non-abortion cases. In F.C.C. v. League of Women Voters, the Court found the Public Broadcasting Act unconstitutional because it prohibited grantees from editorializing, even if such activities were conducted outside the scope of the government program. See 468 U.S. 364, 400 (1984). The Court held that the statute would have been constitutional, however, had it allowed grantees to establish affiliates to editorialize. Id. In Regan v. Taxation With Representation, the Court held that a refusal to fund grantees' lobbying activities was constitutional because it allowed them to engage in the protected conduct through independent affiliates. See 461 U.S. 540, 544-45 (1983). See also National Endowment for the Arts v. Finley, 118 S. Ct. 2168, 2179 (1998) (upholding legislation funding only certain types of art because the legislation did not infringe on protected grantee activities outside the government program).

The question before us, then, is whether the legislation in the present case constitutionally restricts the use of funds within the State family-planning program or unconstitutionally restricts grantee activities outside the program. Specifically, we must decide whether section 10.715 prohibits grantees from engaging in abortion services through independent affiliates.

Tier I of section 10.715 designates funds to the Department of Health:

For the purpose of funding family planning services, pregnancy testing and follow-up services, provided that none of these funds may be expended for the purpose of performing, assisting or encouraging for abortion, and further provided that none of these funds may be expended to directly or indirectly subsidize abortion services or administrative expenses, as verified by independent audit. None of these funds may be paid or granted to organizations or affiliates of organizations which provide or promote abortions. None of the funds may be expended for directly referring for abortion, however nondirective counseling relating to the pregnancy may be provided and nothing in this section requires an

agency receiving federal funds pursuant to Title X of the Public Health Services Act to refrain from performing any service required pursuant to Title X, regulations adopted pursuant to Title X or the Title X Program Guidelines for Project Grants for Family Planning Services as published by the U.S. Department of Health and Human Services in order to remain eligible to receive Title X funds, to be eligible to receive state funds pursuant to this section.

H.B. 1010, § 10.715(1), 89th Leg., 2d Sess. (Mo. 1998).

Although Tier I provides that "organizations or affiliates of organizations which provide or promote abortions" are not eligible for family-planning funds, nothing in Tier I expressly prohibits grantees from maintaining an affiliation with an abortion service provider, so long as the affiliated abortion service provider does not directly or indirectly receive State family-planning funds. Tier I is therefore facially ambiguous regarding whether an organization that receives State funds may be affiliated with an abortion service provider. Several factors weigh in favor of interpreting Tier I to allow such affiliations, however.

Although it does not define the term "promote abortions," Tier I expressly prohibits only "assisting or encouraging for abortion" and "directly referring for abortion." It specifically allows grantees to provide "nondirective counseling relating to the pregnancy." Furthermore, the State has acknowledged that Tier I allows grantees to advocate in favor of abortion outside of any patient relationship and so long as that speech occurs with private funds and outside the scope of the program. See Appellant's Br. at 14.

In addition, Tier I would cross the line established in Rust, League of Women Voters, and Regan, and hence be an unconstitutional condition, if we interpreted it to prohibit grantees from having any affiliation with abortion service providers. We interpret statutes to avoid serious constitutional problems, so long as the statutory

language is fairly susceptible to a constitutional construction. Accordingly, we construe the language of Tier I to allow a grantee to maintain an affiliation with an abortion service provider, so long as that affiliation does not include direct referrals for abortion. Under this construction, Tier I is not an unconstitutional condition, because it allows grantees to exercise their constitutionally protected rights through independent affiliates.

To remain truly "independent," however, any affiliate that provides abortion services must not be directly or indirectly subsidized by a section 10.715 grantee. This will ensure that State funds are not spent on an activity that Missouri has chosen not to subsidize. See Regan, 461 U.S. at 544. No subsidy will exist if the affiliate that provides abortion services is separately incorporated, has separate facilities, and maintains adequate financial records to demonstrate that it receives no State family-planning funds. See Rust, 500 U.S. at 180-81 (requiring abortion services to be physically and financially separate from government-funded program); Regan, 461 U.S. at 544 n.6 (requiring affiliate to be separately incorporated and to not receive any government funds); Legal Aid Soc'y of Hawaii v. Legal Servs. Corp., 145 F.3d 1017, 1025 (9th Cir.), cert. denied, 119 S. Ct. 539 (1998) (upholding regulations requiring affiliates to be separately incorporated and to remain physically and financially independent).

This interpretation of Tier I respects the State's valid policy decision to remove its imprimatur from abortion services and to encourage childbirth over abortion. By requiring abortion services to be provided through independent affiliates, Tier I ensures that abortion service providers will not receive benefits in the form of marketing, fixed expenses, or State family-planning funds from section 10.715 grantees. It respects Planned Parenthood's constitutional rights by allowing it to establish an independent affiliate to provide abortion services outside the government program. See Rust, 500 U.S. at 198; Regan, 461 U.S. at 545. The Constitution does not guarantee that

recipients of State funds will not be required to "expend effort" to comply with funding restrictions.  See Legal Aid of Hawaii, 145 F.3d at 1027 (citing Rust, 500 U.S. at 196).

## B.  Equal Protection

Planned Parenthood also argues that Tier I violates the Equal Protection Clause by discriminating against organizations that provide abortion services.  This argument is based on the notion that physicians and clinics have a fundamental constitutional right to provide abortion services.  Generally, "where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined."  Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 670 (1966).  See also Clark v. Jeter, 486 U.S. 456, 461 (1988) (holding that classifications affecting fundamental rights are subject to the "most exacting scrutiny").

Any constitutional right of clinics to provide abortion services, however, is derived directly from women's constitutional right to choose abortion.  See Planned Parenthood v. Casey, 505 U.S. 833, 884-85 (1992).  In Casey, the Supreme Court set out a new standard of review for regulations that touch upon the right to abortion.  See id. at 871-74 (holding that strict scrutiny does not apply to regulations affecting the right to abortion).  Legislation affecting physicians and clinics that perform abortions, like all legislation affecting abortion access, will be found unconstitutional if it imposes an "undue burden" on women seeking abortions.  Id. at 884-85.  Since Casey, we have applied the undue burden test in cases involving legislation that affects the right to abortion.  See Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1457-58 (8th Cir. 1995) (finding parental notice requirements unconstitutional under the undue burden test); Planned Parenthood of Greater Iowa, Inc. v. Atchison, 126 F.3d 1042, 1048-49 (8th Cir. 1997) (finding state enforcement of clinic certificate-of-need requirements unconstitutional under the undue burden test).

A statute that affects the right to abortion is an undue burden if it has the "purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion." Casey, 505 U.S. at 877. "The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." Id. at 874. Cf. Atchison, 126 F.3d at 1048-49 (finding an undue burden where regulations served no purpose other than restricting abortion access).

The district court made limited factual findings regarding the purpose and effects of section 10.715. See Order of July 17, 1998; Order of June 27, 1996. With respect to legislative purpose, the district court found that the legislature intended to discriminate against abortion service providers in granting State family-planning funds. See Order of July 17, 1998, at 5-6 (citing Order of June 27, 1996). Rather than focusing on this discrimination, however, which is plainly allowed under cases such as Maher, Harris, and Rust, see supra Part II.A, the district court should have focused on whether the legislature intended to place an undue burden in the path of women seeking abortions. The district court could not have found that the legislature intended section 10.715 to be an undue burden on women's access to abortion, because nothing in the record demonstrates such a motive.

To the contrary, the record suggests that the legislature was aware that denying Planned Parenthood's family-planning funds would not affect Planned Parenthood's ability to provide abortion services. Consistent with our interpretation of Tier I in Part II.A above, the comments of the legislators show that discriminating against abortion providers in granting state funds was primarily intended to remove the imprimatur of the State from abortion services. See Statements of Rep. from Jasper County, Appellant's Appx. at 454-55, 476; Statement of Sen. from Boone County, Appellant's Appx. at 401; Statement of Rep. from Buchanan County, Appellee's Appx. at 362; Statement of Sen. from Texas County, Appellant's Appx. at 362.

Nor would Tier I have the effect of placing an undue burden on women seeking abortion services, for the statute would have at most an extremely attenuated effect upon the availability of abortion services. Under <u>Casey</u>, incidental effects are not enough to render unconstitutional a regulation touching on abortion.

Moreover, Planned Parenthood has consistently maintained that State family-planning funds do not subsidize abortion services in any way. Instead, abortion services are funded through independent private sources. Because nothing in section 10.715 restricts Planned Parenthood's use of private funds, it cannot claim that denying it family-planning funds would unduly burden women's access to abortion services.

Tier I is fundamentally different from the statute at issue in <u>Atchison</u>, which we found to serve "no purpose other than to make abortions more difficult." <u>See</u> 126 F.3d at 1049. The statute is intended to effectuate the State's constitutionally permissible decision to favor childbirth over abortion, and any effects limiting women's access to abortion services are strictly incidental and do not constitute an undue burden on a woman's right to abortion.

## C.  Bills of Attainder

Finally, Planned Parenthood argues that section 10.715 is an unconstitutional bill of attainder because it imposes "punishment" without a trial. <u>See</u> <u>Selective Serv. Sys. v. Minnesota Pub. Interest Res. Group</u>, 468 U.S. 841, 846-47 (1984); U.S. Const. art. I, § 9, cl. 3. To constitute a bill of attainder, the statute must (1) specify affected persons, (2) impose punishment, and (3) fail to provide for a judicial trial. <u>See</u> <u>Selective Service</u>, 468 U.S. at 847. Planned Parenthood's claim fails because Tier I of section 10.715 does not impose punishment.

To rise to the level of "punishment" under the Bill of Attainder Clause, harm must fall within the traditional meaning of legislative punishment, fail to further a

nonpunitive purpose, or be based on a congressional intent to punish.  See id. at 852 (citing Nixon v. Administrator of Gen. Servs., 433 U.S. 425, 473 (1977)).  The denial of a noncontractual government benefit will not be deemed punishment if the statute "leaves open perpetually the possibility of qualifying for aid."  Id. at 853.  Tier I allows Planned Parenthood to qualify for family-planning funds by establishing an independent affiliate to perform its abortion services.  Accordingly, it does not fall within the traditional meaning of legislative punishment.  See id. at 852-53.  Further, it serves the nonpunitive interest of removing the State's imprimatur from abortion services, and it was not intended to punish Planned Parenthood for its abortion activities.

## III.

Because section 10.715, as we have construed it, passes constitutional muster, we vacate the preliminary and permanent injunctions entered by the district court, and we remand the case with directions that the complaint be dismissed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-12-