**PLANNED PARENTHOOD ASSOCIATION OF HIDALGO COUNTY TEXAS, INC.; Planned Parenthood Association of Lubbock, Inc.; Planned Parenthood of Cameron and Willacy Counties; Family Planning Associates of San Antonio; Planned Parenthood of Central Texas; Planned Parenthood of Gulf Coast, Inc.; Planned Parenthood of North Texas, Inc.; Planned Parenthood of West Texas, Inc.; and Planned Parenthood of Austin Family Planning, Inc., Plaintiffs,**

v.

**Thomas M. SUEHS, Executive Commissioner, Texas Health and Human Services Commission, in his Official Capacity, Defendant.**

Civil No. A–12–CV–322–LY.

United States District Court,
W.D. Texas,
Austin Division.

April 30, 2012.

Carrie Y. Flaxman, Helene T. Krasnoff, Planned Parenthood Federation of America, Washington, DC, P.M. Schenkkan, Susan G. Conway, Matthew B. Baumgartner, Graves Dougherty Hearon & Moody, PC, Austin, TX, Roger K. Evans, Planned Parenthood Federation of America, New York, NY, for Plaintiffs.

Arthur C. D'Andrea, Assistant Solicitor General, Jonathan F. Mitchell, Office of the Attorney General, Austin, TX, for Defendant.

## ORDER GRANTING PRELIMINARY INJUNCTION

LEE YEAKEL, District Judge.

Before the court in the above styled and numbered cause of action are Plaintiffs' motion for Preliminary Injunction and Memorandum of Law in Support Thereof filed April 11, 2012 (Clerk's Doc. No. 2) and Defendant's Response to Plaintiffs' Motion for Preliminary Injunction and Memorandum of Law in Support Thereof filed April 18, 2012 (Clerk's Doc. No. 18). On April 19, 2012, the court held a hearing on Plaintiffs' motion, at which all parties appeared and were represented by counsel. Having considered the motion, response, the arguments of counsel, the case file, and the applicable law, the court will grant the requested preliminary relief.

## I. BACKGROUND

This suit seeks to enjoin the enforcement of a recent administrative rule promulgated by the Texas Health and Human Services Commission (the Commission), which has the effect of excluding Plaintiffs—nine Planned Parenthood organizations—from providing preventive health and family-planning services through Texas's Women's Health Program. The Women's Health Program was established by the Texas Legislature in 2005 as a five-year demonstration project to expand access to preventive health and family-planning services for uninsured women, ages 18–44, with a net family income at or below 185 percent of the federal poverty level. Act of May 30, 2005, 79th Leg.,

R.S., ch. 816, § 1, 2005 Tex. Gen. Laws 2816, 2816–18 (expired Sept. 1, 2011) (the 2005 Act). Under the program, Texas provides a limited Medicaid benefit package of family-planning and related services to a population currently not covered under the Medicaid state plan.[1] The program was approved for a demonstration waiver under Title XI of the federal Social Security Act. *See* 42 U.S.C. § 1315. The Social Security Act gives the Secretary of Health and Human Services of the United States discretion to approve a state demonstration project for a waiver of certain Medicaid requirements, in order to allow the state to test new ways to deliver and pay for health-care services and to use Medicaid funds in ways not otherwise allowed by federal rule.[2] *Id.* The Commission began implementing the Women's Health Program in 2007 with 90 percent of the program's services funded by federal reimbursements.

The rule at issue in this suit has its origins in the 2005 Act authorizing the Commission to create the Women's Health Program. The act contained a provision prohibiting the Commission from using program funds "to perform or promote elective abortions" and from contracting with "entities that perform or promote elective abortions or are affiliates of entities that perform or promote elective abortions." 2005 Act at 2818. The act did not define "affiliates" or "promote." Due to litigation in Texas and other states challenging similar no-affiliation directives, the Commission, under the direction of former Commissioner Albert Hawkins, originally took the position that the act, if construed to exclude Plaintiffs from the Women's Health Program, would likely not survive a constitutional challenge. As a result, Plaintiffs have participated in the Women's Health Program since its inception, despite their relationship to Planned Parenthood Federation of America, a national reproductive health-care provider that advocates for women's access to abortion.

Plaintiffs operate 49 health centers across Texas, where women can enroll and participate in the Women's Health Program. None of Plaintiffs' centers provide abortion services. In order to ensure that no state or federal funds are spent on abortions, Plaintiffs maintain legal and financial separation from those Planned Parenthood entities that provide such services.[3] Plaintiffs' centers have

---

**1.** *See* Medicaid & CHIP Program Information on Texas Women's Health Waiver, http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/tx/tx-womens-health-waiver-fs.pdf (last updated Apr. 23, 2012).

**2.** Although the record is not fully developed at this time, it appears that the waiver's significance to the Women's Health Program is that the waiver allows a population not otherwise eligible for Medicaid to receive the program's services paid for by state and federal funds.

**3.** The legal and financial separation between Plaintiffs and those Planned Parenthood entities providing abortions came about as a result of prior litigation challenging a similar no-affiliation directive in the context of a federal family-planning program administered by the Texas Department of Health. *See Planned Parenthood of Houston & Se. Tex. v. Sanchez,* 403 F.3d 324 (5th Cir.2005) (reviewing constitutionality of Texas statutory provision prohibiting distribution of family-planning funds to "individuals or entities that perform elective abortion procedures or that contract with or provide funds to individuals or entities for the performance of elective abortion procedures"). The Fifth Circuit Court of Appeals interpreted the directive as permitting the creation of separate legal entities that perform abortions but receive no federal funds and remanded the case to the district court for further proceedings consistent with this interpretation. *Id.* at 337–38. On remand, the parties reached a settlement, and the Planned Parenthood organizations agreed to create separate corporate entities with distinguishable names and boards of directors

historically provided a significant percentage of the Women's Health Program's family-planning services. According to Plaintiffs' complaint, at least 49% of the approximately 103,000 women who obtained services through the program in 2010 obtained some services at a Planned Parenthood provider. These women represent a population that, without the Women's Health Program, would likely be unable to obtain health care. To qualify for participation in the program, a woman must demonstrate that she has a family income at or below 185 percent of the federal poverty level, is not otherwise eligible for Medicare, Medicaid, and the Children's Health Insurance Program (CHIP), and has no alternate health-insurance coverage.[4]

The 2005 Act expired September 1, 2011, at the close of the Women's Health Program's five-year demonstration period. *Id.* In anticipation of its expiration, the Texas Legislature attached Rider 62 to the 2011 General Appropriations Act to provide for the program's continuation. Act of May 31, 2011, 82nd Leg., R.S., ch. 1355, 2011 Tex. Gen. Laws 4025, 4228 (effective Sept. 1, 2011). Rider 62 restates the financial eligibility requirements for the program and directs the Commission to continue the Women's Health Program under Medicaid, contingent on the program's receiving an extension of the previous waiver. *Id.* In order to ensure that the program remained subject to the no-affiliation directive contained in the expired 2005 Act, the Legislature enacted a new no-affiliation provision, providing that:

The [Commission] shall ensure that money spent for purposes of the demonstration project for women's health care services under former Section 32.0248, Human Resources Code, or a similar successor program is not used to perform or promote elective abortions, or to contract with entities that perform or promote elective abortions or affiliate with entities that perform or promote elective abortions.

Act of June 28, 2011, 82nd Leg., 1st C.S., ch. 7, § 1.19, 2011 Tex. Gen. Laws 5390, 5425 (codified at Tex. Hum. Res.Code § 32.024(c–1)) (effective Sept. 28, 2011) (Section 32.024(c–1)). The Commission subsequently requested renewal of the Women's Health Program's waiver. The federal government temporarily extended the waiver until March 31, 2012, to consider the Commission's application for renewal. The program continued to operate with federal funding, as previously administered, through the beginning of 2012.

On February 23, 2012, the Commission, under the direction of current Commissioner, Defendant Thomas M. Suehs (the Commissioner), adopted the rule challenged in this litigation. 37 Tex. Reg. 1696 (2012) (to be codified at 1 Tex. Admin. Code §§ 354.1361–.1364) (Tex. Health & Hum. Servs. Comm'n) (effective March 14, 2012). The rule defines the terms "affiliate" and "promote" for purposes of Section 32.024(c–1). *Id.* The rule defines "affiliate" as

(A) An individual or entity that has a legal relationship with another entity, which relationship is created or governed by at least one written instrument that demonstrates:

and separate financial records that are audited by Texas every two years to ensure adequate separation.

4. *See* Medicaid & CHIP Program Information on Texas Women's Health Waiver, http://

www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/tx/tx-womens-health-waiver-fs.pdf (last updated Apr. 23, 2012).

(i) common ownership, management, or control;

(ii) a franchise; or

(iii) the granting or extension of a license or other agreement that authorizes the affiliate to use the other entity's brand name, trademark, service mark, or other registered identification mark.

(B) The written instruments referenced in subparagraph (A) of this paragraph may include a certificate of formation, a franchise agreement, standards of affiliation, bylaws, or a license.

*Id.* The rule defines "promotes" as "[a]dvocates or popularizes by, for example, advertising or publicity." *Id.* The rule expressly excludes hospitals licensed under the Texas Health and Human Safety Code from compliance with the no-affiliation directive. *Id.*

In light of the new rule, the federal government refused to extend or renew the Women's Health Program's waiver on the basis that the rule conflicts with a provision of the Social Security Act that assures free choice of family-planning providers. *See* 42 U.S.C. § 1396A(a)(23) ("[A]ny individual eligible for medical assistance ... may obtain such assistance from any institution, agency, ... or person, qualified to perform the service ... who undertakes to provide ... such services."). The federal government also advised the Commission that it would continue federal funding for the Women's Health Program through a two-stage phase-out period of no more than nine months. The Texas Governor has instructed the Commissioner and the Commission to continue the operation of the Women's Health Program as a fully state-funded program, without the assistance of federal Medicaid funds, in full compliance with the new rule.[5]

The Texas Medicaid & Healthcare Partnership, the entity that administers claims processing for the Women's Health Program, advised Plaintiffs of the new rule and that Plaintiffs were required to certify before May 1, 2012, that they do not perform or promote elective abortions, do not affiliate with any entity that does, and that Plaintiffs' failure to certify compliance with the rule would result in disqualification from participating in the Women's Health Program effective May 1, 2012.

Plaintiffs assert that, although they maintain legal and financial separation from any entity that performs abortions and do not provide or encourage women participating in the Women's Health Program to have abortions, they are unable to certify compliance with the new rule for numerous reasons. First, Plaintiffs concede that each of their organizations engages in advocacy and public education activities intended to protect and facilitate access to safe and legal abortions. *See* 1 Tex. Admin. Code § 354.1362(6) (defining "promote" as "advocates or popularizes" for purposes of statutory prohibition against contracting with entities that perform or "promote" elective abortions). Second, all but one Plaintiff are affiliated with an entity that provides abortion care and that advertises that it provides those services. *See id.* at § 354.1362(1)(A) (defining "affiliate" as "a legal relationship with another entity" for purposes of statutory prohibition against contracting with entities that "affiliate" with entities that

---

**5.** It is unclear whether Texas will have any funds available for a completely state-run Women's Health Program, as Rider 62's authorization of the continuation of the Women's Health Program, after the expiration of the original five-year demonstration period, is contingent on an extension of the original waiver. *See* Act of May 31, 2011, 82nd Leg., R.S., ch. 1355, 2011 Tex. Gen. Laws 4025, 4228 (effective Sept. 1, 2011).

perform or promote abortion). Third, although Plaintiffs and their affiliated abortion providers have easily distinguishable names, all use the registered service mark "Planned Parenthood" in providing medical services. *See id.* at § 354.1362(1)(A)(iii) (defining "legal relationship with another entity" as including shared use of "brand name, trademark, service mark, or other registered identification mark"). Finally, Plaintiffs are all affiliates or ancillary organizations of affiliates of Planned Parenthood Federation of America, which advocates for women's access to abortion and requires that its affiliates do the same. *See id.* at § 354.1362(1)(A)(i) (defining "legal relationship with another entity" as including "common ownership, management, or control"). Plaintiffs assert that the new rule completely bars their participation as providers of family-planning services through the Women's Health Program.

Unable to certify compliance with the new rule, Plaintiffs filed this action, challenging the rule and Section 32.024(c–1) on federal constitutional and state-law grounds. *See* 28 U.S.C. § 1367; 42 U.S.C. § 1983. Accompanying their complaint was a request for preliminary injunctive relief, requesting that this court bar the rule from going into effect May 1, 2012.

## II. LEGAL STANDARD

■ The purpose of a preliminary injunction is to prevent irreparable injury to the parties and "preserve the court's ability to render a meaningful decision on the merits." *Meis v. Sanitas Serv. Corp.,* 511 F.2d 655, 656 (5th Cir.1975). To obtain a preliminary injunction, Plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits of their claim; (2) a substantial threat of irreparable injury or harm if the injunction is not granted; (3) that the threatened injury to Plaintiffs out-

weighs any harm that the injunction might cause Texas; and (4) that granting the injunction will not disserve the public interest. *See Karaha Bodas Co., L.L.C v. Perusahaan Pertambangan Minyak Dan Gas,* 335 F.3d 357, 363 (5th Cir.2003). A preliminary injunction is an extraordinary remedy, which should only be granted if the party seeking the injunction has clearly carried the burden of persuasion on all four requirements. *Id.* The decision to grant or deny a preliminary injunction is within the sound discretion of the district court and may be reversed only for a clear abuse of discretion. *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.,* 878 F.2d 806, 809 (5th Cir.1989).

## III. ANALYSIS

Plaintiffs' complaint alleges that the Commission's rule violates both the United States Constitution and Texas law. Before evaluating whether Plaintiffs are entitled to a preliminary injunction, the court will address the Commissioner's contention that this court lacks jurisdiction over Plaintiffs' state-law claim under Texas's Eleventh Amendment immunity from suit.

### A. Eleventh Amendment Immunity

■ The Eleventh Amendment bars a private citizen from bringing suit against a state in federal court, unless the suit falls within the narrow exception articulated by the Supreme Court in *Ex Parte Young.* U.S. Const. amend. XI; *McKinley v. Abbott,* 643 F.3d 403, 405 (5th Cir.2011) (citing *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). "The *Young* exception has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States." *Id.* at 406 (internal quotation and citation omitted). "This exception strips the individual state actor of immuni-

ty and allows a private citizen to sue that individual in federal court for prospective injunctive relief based on allegations that the actor violated federal law." *Id.* Because a state-law claim does not implicate federal rights, the *Young* exception does not apply to a state-law claim brought against a state in federal court. *Id.*

■■ The Eleventh Amendment's jurisdictional bar extends to a suit against a state agency or department, as well as a suit against a state official sued in his official capacity, because such a suit is functionally against the state itself. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100–01, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *McKinley,* 643 F.3d at 406. Because Plaintiffs brought suit against the Commissioner in his official capacity, the Eleventh Amendment bars Plaintiffs' claim that the Commission's rule is void and unenforceable under Texas law. *See McKinley,* 643 F.3d at 406. Accordingly, Plaintiffs state-law claim must be dismissed.

The Commissioner does not raise an immunity defense to Plaintiffs' federal constitutional claims. The court finds that jurisdiction over these claims is proper under *Ex Parte Young,* as Plaintiffs seek only prospective declaratory and injunctive relief. *See* 209 U.S. at 160, 28 S.Ct. 441; *see also Planned Parenthood of Cent. N.C. v. Cansler,* 804 F.Supp.2d 482, 489–90 (M.D.N.C.2011) (rejecting Eleventh Amendment immunity defense in suit seeking to enjoin Secretary of North Carolina Department of Health and Human Services from enforcing state legislation that allegedly violated the federal constitution). That Plaintiffs' federal constitutional claims are properly before this court does not affect this court's immunity analysis of Plaintiffs' state-law claim. The Eleventh Amendment applies equally to pendent state-law claims asserted under this court's supplemental jurisdiction. *See Pennhurst,* 465 U.S. at 120, 104 S.Ct. 900. Having concluded that this court has jurisdiction over Plaintiffs' federal constitutional claims but not their state-law claim, the court will consider Plaintiffs' request for a preliminary injunction only as to their constitutional claims.

## B. Entitlement to Preliminary Relief

### 1. Substantial Likelihood of Success on the Merits

■ To obtain a preliminary injunction, Plaintiffs must first show a substantial likelihood that they will succeed on the merits of their claims, once the case proceeds to a full and complete trial. *Lakedreams v. Taylor,* 932 F.2d 1103, 1107 (5th Cir.1991). To do so, Plaintiffs need not prove their case. *See id.* at 1109 n. 11. Nor must Plaintiffs demonstrate a substantial *certainty* of success. *See Schiavo ex rel. Schindler v. Schiavo,* 403 F.3d 1223, 1232 (11th Cir.2005) ("A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success."); *see also Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *cf. Ruiz v. Estelle,* 650 F.2d 555, 565 (5th Cir.1981). Plaintiffs allege that the Commission's rule and Section 32.024(c–1) impose unconstitutional conditions on Plaintiffs' eligibility to participate in the Women's Health Program and violate their right to equal protection under the laws. To warrant the issuance of a preliminary injunction, Plaintiffs must demonstrate that they are likely to prevail on these claims.

### i. Unconstitutional Condition

■ Under the unconstitutional-conditions doctrine, although a person has no "right" to government funding, the government "may not deny a benefit to a person on a basis that infringes his constitutional-

ly protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). If the government were permitted to deny a benefit because the applicant for such benefit had exercised a constitutional right, the applicant's "exercise of [that] freedom[ ] would in effect be penalized and inhibited," thereby allowing the government "to produce a result which it 'could not command directly.'" *Id.* (quoting *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)). The Supreme Court has distinguished between conditions targeting a particular program or service from conditions aimed at the recipient of the government benefit. *See Rust v. Sullivan*, 500 U.S. 173, 196, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

■ It is well-established that the government is entitled to define the limits of a publicly funded program. *Id.* at 194, 111 S.Ct. 1759. "The [g]overnment can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Id.* at 193, 111 S.Ct. 1759. For there is a "basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Id.* at 193, 111 S.Ct. 1759 (citing *Maher v. Roe*, 432 U.S. 464, 475, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977)). It follows that, in accordance with a government program's legitimate policy objectives, the government may refuse to fund activities, including protected activities, which are "specifically excluded from the scope of the project funded." *Id.* at 194–95, 111 S.Ct. 1759. This is because such conditions leave the grantee of government funds "unfettered in its other activities" outside of the publicly funded program. *Id.* at 196, 111 S.Ct. 1759 (upholding funding limitation prohibiting abortion-related activities, including speech, within scope of program activities).

■ But the government may not condition participation in a government program or receipt of a government benefit upon an applicant's exercise of protected rights. For example, the Supreme Court has held that South Carolina could not deny unemployment compensation benefits to an employee who was discharged for her refusal to work on Saturday, the Sabbath day of her faith. *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The Court reasoned that such indirect "discouragements" of the exercise of a protected right "undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions, or taxes." *Id.* at 404 n. 5, 83 S.Ct. 1790. And in a case more analogous to the facts at issue here, the Supreme Court has held that California could not condition receipt of a veterans' property-tax exemption on a veteran's completion of an oath swearing that the veteran does not advocate overthrow of the government by unlawful means. *Speiser*, 357 U.S. at 532, 78 S.Ct. 1332. For "to deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech." *Id.* at 518, 78 S.Ct. 1332. Conditions on recipients of government benefits that implicate fundamental rights, such as free speech and free exercise, are subject to strict scrutiny and will only be upheld if shown to be "necessary to promote a compelling government interest." *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). In such cases, there need not be a showing of an actual effect of deterring exercise of the right to trigger strict scrutiny, only that

the classification "serves to penalize the exercise of that right." *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 258, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (citing *Dunn v. Blumstein*, 405 U.S. 330, 339–40, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972)).

Plaintiffs allege that the Commission's rule imposes three unconstitutional conditions on their participation in the Women's Health Program. They argue that the rule conditions their participation on the surrender of their First Amendment right to advocate to protect access to safe and legal abortion services, their First Amendment right to associate with Planned Parenthood Federation of America and other entities providing abortion services, and their Fourteenth Amendment right to provide abortion services through legally and financially separate affiliates.

■ The rights to free speech and association are fundamental rights safeguarded by the First Amendment from invasion by the states. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 n. 1, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (citing *Whitney v. California*, 274 U.S. 357, 373, 47 S.Ct. 641, 71 L.Ed. 1095 (1927)). By advocating for women's access to safe and legal abortion services and associating with entities providing such services, Plaintiffs are exercising these fundamental rights. Section 32.024(c–1), as interpreted by the Commission's rule, implicates these rights by conditioning Plaintiffs' participation in the Women's Health Program on their speech and associations. By requiring Plaintiffs to certify that they do not "promote" elective abortions and that they do not "affiliate" with entities that perform or promote elective abortions, as defined by the rule, Texas is reaching beyond the scope of the government program and penalizing Plaintiffs for their protected conduct.

The Supreme Court has sought to avoid the constitutional infirmities of conditions that broadly impinge upon the exercise of fundamental rights by construing the conditions to permit the creation of legally distinct affiliates to ensure the separation of public funds from protected conduct exercised outside the scope of a government program. *See Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 545, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (upholding federal prohibition on tax-exempt charitable organizations using tax-deductible contributions to support their lobbying efforts given alternative of creating legally distinct affiliates free to engage in First Amendment activity). If such division was not possible, the Court invalidated the condition. *See FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 400, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (invalidating portion of Public Broadcasting Act of 1964 which prohibited noncommercial television and radio stations that receive federal grants from engaging in all editorializing because recipients were unable to segregate their activities according to source of funding).

The ability of independent affiliates to exercise protected rights is a critical component in lower-court decisions upholding similar no-affiliation directives seeking to insulate government funds from abortion and abortion-related speech. In reviewing Missouri legislation prohibiting the award of state family-planning funds to organizations or affiliates of organizations that "provide or promote abortions," the Eighth Circuit Court of Appeals upheld a statute against an unconstitutional-conditions challenge, concluding that the law "allows grantees to exercise their constitutionally protected rights through independent affiliates." *Planned Parenthood of Mid–Mo. & E. Kan., Inc. v. Dempsey*, 167 F.3d 458, 463 (8th Cir.1999). The Eighth Circuit defined the constitutional dividing

line as "whether the legislation ... constitutionally restricts the use of funds within the State family-planning program or unconstitutionally restricts grantee activities outside the program." *Id.* at 462.

Similarly, the Fifth Circuit interpreted a no-affiliation directive prohibiting the distribution of federal funds to entities that "contract with or provide funds to individuals or entities for the performance of elective abortion procedures." *Planned Parenthood of Houston & Se. Tex. v. Sanchez,* 403 F.3d 324, 328 (5th Cir.2005). The court upheld the statute against a Supremacy Clause challenge, construing the provision as not precluding the creation of independent affiliates engaged in abortion activities, noting that, absent the possibility of affiliates, the statute would likely be unconstitutional. *Id.* at 338.

■ It is not possible to read Section 32.024(c–1), as defined by the Commission's rule, as permitting the possibility of affiliates. Following *Sanchez,* Planned Parenthood restructured its Texas organization so that entities receiving public funds do not engage in abortion services. Plaintiffs' 49 health centers, providing family-planning services through the Women's Health Program, have legally and financially distanced themselves from the Planned Parenthood organizations that perform abortion. By defining "affiliate" in broad terms, to include shared "ownership, management, or control" or a shared "name, trademark, service mark, or other identification mark," the Commission's rule effectively forecloses any workable system of affiliates. Accordingly, this court finds that Section 32.024(c–1), as defined by the Commission's rule impinges on Plaintiffs' First Amendment speech and associational rights and cannot be saved by an alternative construction. Accordingly, the rule will not withstand constitutional scrutiny, unless Texas comes forth with a compelling interest to justify the rule's existence. *See Shapiro,* 394 U.S. at 634, 89 S.Ct. 1322.

It is unlikely that Texas will be able to do so, even accepting the Commissioner's assertion that one purpose of the Women's Health Program is to reduce elective abortions by preventing unwanted pregnancies by subsidizing birth-control strategies that do not involve elective abortions. The Women's Health Program, by statute, was created to provide uninsured Texas women with preventive health and family-planning services. Act of May 30, 2005, 79th Leg., R.S., ch. 816, § 1, 2005 Tex. Gen. Laws 2816, 2817. Such services include medical-history evaluations, physical examinations, health screenings for diabetes, cervical and breast cancer, and sexually transmitted diseases, and counseling and education about, and the provision of, contraceptives. *Id.* Plaintiffs have submitted sworn declarations to the court attesting to the fact that they do not provide abortion services or counsel a women participating in the Women's Health Program to seek an abortion. Plaintiffs further attest that they do not directly or indirectly subsidize the abortion-care services provided by their legally and financially distinct affiliates. Texas may have a compelling interest in protecting and promoting respect for fetal life after viability, but the record does not reflect that Section 32.024(c–1), as defined by the Commission's rule, is necessary to advance that interest. *See Planned Parenthood of Se. Penn. v. Casey,* 505 U.S. 833, 929–30, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("With respect to the State's interest in potential life, 'the "compelling" point is at viability....'") (Blackmun, J., concurring) (citing *Roe v. Wade,* 410 U.S. 113, 163, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)).

Nor has the Commissioner alleged that there is inadequate separation of funds

under the current affiliate arrangement or that there is a question as to whether government funds are being used to provide abortion services. Rather, the Commissioner argues that Plaintiffs' receipt of government funds for non-abortion-related activities effectively "frees up" organizational funds for use on abortion-related services. The courts have not looked favorably upon this argument, as it extends too far. *See Planned Parenthood of Cent. & N. Ariz. v. Arizona,* 718 F.2d 938 (9th Cir.1983) (rejecting similar argument because it could lead to conclusion that a state could refuse all Medicaid benefits to otherwise eligible applicant on basis that subsidy "freed up" personal funds for use on abortion).

Moreover, the Commissioner presents the court with no relevant support for his primary legal argument in support of the challenged rule: that a state may condition participation in a government program on account of constitutionally protected conduct, even if the conduct occurs outside the scope of the federally funded program, so long as the condition is germane to the purposes of the benefits conferred. The Commissioner's germaneness argument does not appear in the Supreme Court's unconstitutional-conditions cases and is notably absent from *Rust,* in which the Court evaluated funding restrictions related to abortion.

The Commissioner directs this court to cases arising in the unique context of public employment, where the Supreme Court has found that, in the interest of the effective administration and integrity of government, the government may limit the partisan political activities of federal employees. *See U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (upholding Hatch Act, which declares unlawful certain specified political activities of federal employees even though prohibition extends to after-hours activity); *United Pub. Workers of Am. v. Mitchell,* 330 U.S. 75, 95, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (same); *see also Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) (reviewing authority of government employer to regulate employee's speech content under distinct line of public-employment jurisprudence as established in *Pickering v. Board of Education of Township High School District 205, Will Cnty., Ill.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). The Commissioner also directs this court to *South Dakota v. Dole,* a case that does no more than establish that Congress may, incident to the Spending Clause, attach conditions to states' receipt of federal funds, if the conditions are in pursuit of the general welfare and do not compel states to engage in activities that would themselves be unconstitutional. *See* 483 U.S. 203, 210, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (holding that Congress could condition states' receipt of federal highway funds on adoption of minimum drinking age of 21). This court does not find these cases to be relevant or instructive.

Were this court to adopt the Commissioner's germaneness argument in the context of a condition that unquestionably touches on fundamental constitutional rights, it would eviscerate the strict-scrutiny standard governing such conditions, applying a standard more akin to rational-basis review. *See Shapiro,* 394 U.S. at 634, 89 S.Ct. 1322 (where fundamental rights involved, government must come forth with more than rational relationship between condition and "admittedly permissible state objectives"). Germaneness may be relevant as to whether a condition limiting the use of government funds ultimately furthers the ends advanced as the justification for the prohibition, as is required to uphold any condition on the grant of a

benefit. *See, e.g., Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 747–48 (1st Cir.1995) (holding that bylaw prohibiting licensed entertainment businesses from operating between 1:00 a.m. and 6:00 a.m. was closely related to core purpose of law, which was to preserve nighttime tranquility of community, and therefore valid). However, germaneness is not the ultimate test of a condition's constitutionality, and germaneness considerations cannot subsume the government's burden to satisfy this court's strict scrutiny.

In sum, the court concludes that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their unconstitutional-conditions claims based on their First Amendment rights to speech and association. The case law is less clear on the merits of Plaintiffs' unconstitutional-conditions claim based on their Fourteenth Amendment right to provide abortion services through legally and financially separate affiliates. Having reviewed the case law concerning affiliates, the court finds that these cases do not endorse a separately cognizable constitutional right. Rather, they rely upon the possibility of affiliates to cure some other constitutional infirmity, such as a free-speech or Supremacy Clause violation. *See Sanchez*, 403 F.3d at 328; *Dempsey*, 167 F.3d at 463. Plaintiffs' reduced likelihood of success on the merits of their Fourteenth Amendment claim is not fatal to their request for preliminary injunctive relief.

### ii. Equal Protection

■ Plaintiffs allege that by exempting hospitals that provide abortion services from compliance with the Commission's rule, Texas denies Plaintiffs equal protection of the laws without adequate basis for the differential treatment. Equal-protection claims are typically subject to ration-al-basis review unless the challenged legislation "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *Maher*, 432 U.S. at 470, 97 S.Ct. 2376 (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)). The challenged rule likely impinges upon a fundamental constitutional right. Accordingly, Texas must show a compelling interest for its policy choice of relieving hospitals licensed under the Texas Health and Human Safety Code from compliance with the no-affiliation directive.

■ As previously stated, the current unrebutted record reflects that Plaintiffs neither perform abortion nor counsel women participating in the Women's Health Program to seek abortions. Furthermore, Plaintiffs maintain legal and financial separation from entities providing abortion services. Accordingly, Texas's policy choice of exempting hospitals from compliance with the rule is arguably not rationally related to the Women's Health Program's purpose of reducing elective abortions, much less reflective of a compelling interest necessary to advance that goal. Plaintiffs allege that the exempt hospitals provide or promote elective abortion services. If so, Texas's differential treatment of Plaintiffs' 49 health centers, which do not provide abortion services, is unlikely to withstand constitutional scrutiny.

### 2. *Substantial Threat of Irreparable Injury*

■ Plaintiffs demonstrate a substantial threat of irreparable injury if immediate relief is not granted. *See Karaha Bodas Co.*, 335 F.3d at 363. If Plaintiffs are unable to certify compliance with Section 32.024(c–1) before May 1, 2012, they will no longer be eligible for participation in the Women's Health Program. As a

result, Plaintiffs assert that they will collectively lose approximately $13.5 million in annual funding for preventive health and family-planning services and will be required to close clinics and lay off staff. Even if the funding were to be reinstated in the future, Plaintiffs argue that it will be exceedingly expensive, if not impossible, to resume operations of their clinics as they exist today. According to Plaintiffs' sworn declarations, Planned Parenthood of North Texas stands to lose approximately $2 million in annual funding. Planned Parenthood Association of Hidalgo County attests that it will lose $1.4 million in annual funding, which is 50 percent of its operating budget, and will be forced to lay off 15 to 35 staff members and close two of its three health centers. Planned Parenthood of Lubbock states that it will lose 60% of its revenue, making it nearly impossible to continue operation of its one health center, and Planned Parenthood of West Texas represents that it will lose 40% of its revenue. Planned Parenthood of West Texas asserts that it has already closed one health center and reduced hours at another center in anticipation of the loss of Women's Health Program funding. These declarations establish that Plaintiffs' inability to certify compliance with Section 32.024(c–1) will cause them substantial and irreparable harm, even if funding is ultimately restored after full consideration of the merits of this case.

### 3. *Balancing Harm*

■ Plaintiffs must also show that their threat of irreparable harm outweighs the potential injury to Texas if the injunction is granted. *See id.* The Commissioner argues that if Planned Parenthood obtains the relief it seeks, the entire Women's Health Program will be shut down, because Texas enacted the program on the condition that Planned Parenthood entities would be excluded from funding. According to the sworn declaration provided by the Commissioner, "[i]f Plaintiffs obtain an injunction . . ., state law will require the Commission to cease operating the Program upon termination of federal funding. . . ." The record reflects that it is the federal government's intent to continue funding the Women's Health Program for another nine months as a part of a two-stage phase-out of federal funding. This court anticipates rendering a final judgment on the merits in this case before the phase-out period is complete. Accordingly, the asserted injury to Texas cannot outweigh the imminence of the injury faced by Plaintiffs were this court to deny the injunction.

### 4. *Public Interest*

■ Finally, Plaintiffs must demonstrate that enjoining enforcement of the Commission's rule is in the interest of the public. The enforcement of the rule will result in a significant reduction in funding of family-planning services to uninsured women on May 1, 2012. Plaintiffs' assert that almost one half of women participating in the Women's Health Program in calendar year 2010 obtained some services at a Planned Parenthood clinic. Plaintiffs' sworn declarations establish that their loss of funding will deprive thousands of Texas women of critical health services, especially in rural areas in which no alternative provider to the Women's Health Program is available. For example, Planned Parenthood of North Texas asserts that some of the counties in its service region have no other program providers to serve the nearly 7,000 women it currently serves through the program. Planned Parenthood of Hidalgo County attests that it is the largest program provider in its region and currently provides program services to nearly 6,500 women. Planned Parenthood Association of Lubbock states that it currently

provides program services to nearly 2,000 women, and other providers in the region have a three-to-four-month waiting period for an appointment. Planned Parenthood of West Texas currently provides program services to more than 3,000 women and represents that other providers in the region do not have the capacity to absorb these patients. Moreover, women currently participating in the Women's Health Program are not the only members of the public that would be harmed by this court's denial of an injunction. If Plaintiffs are forced to close some health centers or to reduce their centers' hours, the tens of thousands of additional clients they serve will also be harmed.

The record demonstrates that Plaintiffs currently provide a critical component of Texas's family-planning services to low-income women. The court is unconvinced that Texas will be able to find substitute providers for these women in the immediate future, despite its stated intention to do so. The establishment of replacement services is of particular concern to the court given the imminence of the substantial loss of program providers on May 1, 2012. Accordingly, the court finds that the public interest is best served by allowing Plaintiffs to continue to receive government funds to provide family-planning services to women throughout Texas while this case is pending.

## IV. CONCLUSION

Plaintiffs have satisfied their burden of persuasion on the four factors necessary for them to be entitled to maintain the status quo that exists between them and the State of Texas, pending this court's determination of the merits of Plaintiffs' allegations. In balancing the relative harm to the parties and the court's concern for the interest of the public, the court is particularly influenced by the po-

tential for immediate loss of access to necessary medical services by several thousand Texas women. The record before the court at this juncture reflects uncertainty as to the continued viability of the Texas Women's Health Program. Rider 62 is contingent on extension of the program's original federal waiver, a waiver that expired March 31, 2012. Federal funds available to the Women's Health Program are being phased out. Although the Governor has instructed that the program is to continue fully funded by Texas, the current record gives the court no comfort that funds are or will be available to continue the program after the phase out of federal funds.

Although this court expresses skepticism as to the viability of the Women's Health Program and holds that Plaintiffs are entitled to their requested interlocutory relief, the court does not today determine the ultimate outcome of this dispute. That must await a fully developed record. The court today does no more than preserve the relative positions of the parties until a thorough airing of the issues by trial occurs. The court observes that if the federal funds are phased out, Texas does not provide another source of funds, and the Women's Health Program terminates, the controversy now before the court may be of no consequence.

**IT IS THEREFORE ORDERED** that Plaintiffs' fifth claim for relief, arising under Texas state law, is **DISMISSED WITHOUT PREJUDICE,** as barred by the Eleventh Amendment.

**IT IS FURTHER ORDERED** pursuant to Rule 65(a) of the Federal Rules of Civil Procedure that Plaintiffs' request for a preliminary injunction is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant Thomas M. Suehs, Executive Commissioner of the Texas Health and Human Services Commission, and his

889

agents, employees, appointees, and successors are **HEREBY ENJOINED,** pending final judgment, from enforcing, threatening to enforce, or otherwise requiring Plaintiffs to show compliance with the administrative rules to be codified at Sections 354.1361–1364 of Title 1 of the Texas Administrative Code.

**IT IS FURTHER ORDERED** that no bond shall be required from Plaintiff as a result of this preliminary injunction and that this injunctive relief is effective immediately.

**IT IS FINALLY ORDERED** that the parties meet and confer on all matters they must accomplish before a trial may be held. The court expects the parties to agree not only on such matters but on a reasonable schedule to accomplish them. This case is **SET** for a scheduling conference at **1:30 p.m. on Friday, May 18, 2012.** The parties shall be prepared to discuss a pretrial schedule and trial date at that time.